# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 24, 2012

No. 11-51151

Lyle W. Cayce
Clerk

PHILIP CANNATA

Plaintiff-Appellant

v.

CATHOLIC DIOCESE OF AUSTIN; ST. JOHN NEUMANN CATHOLIC
CHURCH

Defendants-Appellees

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS, DENNIS, and HAYNES, Circuit Judges.

DENNIS, Circuit Judge:

Philip E. Cannata brought suit against the Catholic Diocese of Austin and St. John Neumann Catholic Church ("Appellees" or "the church"), alleging that the church terminated him in violation of the Age Discrimination in Employment Act ("ADEA") and the Americans with Disabilities Act ("ADA"). The district court dismissed the suit based on the ministerial exception, which bars employment-discrimination suits by ministers against their churches. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 702-09 (2012) (affirming the existence of the ministerial exception).

No. 11-51151

This appeal presents the first opportunity for this court to address the ministerial exception in light of *Hosanna-Tabor*. Because we conclude that there is no genuine issue of material fact that the ministerial exception applies, and therefore bars Cannata's suit, we AFFIRM the judgment of the district court.

## BACKGROUND

### A.

In 1998, Cannata became the Music Director at St. John Neumann Catholic Church. In this position, Cannata oversaw the Music Department's budget and expenditures, managed the sound systems at the church and maintained the sound equipment, music room, and music area in the sanctuary, and rehearsed with members of the choir and cantors and accompanied them on the piano during services while running the soundboard. Cannata only worked during the evening and on weekends, so the church hired his wife to perform the day-to-day responsibilities of the music program, Leonard Johnson as Choir Director, and Cannata's daughter to work with the children's choir. Furthermore, all of the liturgical responsibilities belonging to Cannata's predecessor were given to Judy Gesch, St. John Neumann's Business Manager, because Cannata lacked the requisite education, training, and experience. In August 2007, the parish pastor, Father Kirby Garner, fired Cannata.[1]

### B.

Cannata, proceeding pro se, brought suit against Appellees, alleging that his termination was in violation of the ADEA and the ADA. Appellees twice

---

[1] Cannata makes a number of factual allegations regarding the circumstances of his termination, ostensibly in support of his employment-discrimination claims. However, this appeal presents the question of whether the ministerial exception bars Cannata's suit. Because the district court dismissed his suit on procedural grounds, it would be inappropriate to evaluate the merits of Cannata's claims. Moreover, because we conclude that there is no genuine issue of material fact that the ministerial exception applies, we are precluded from scrutinizing the church's motives for terminating Cannata. *See Hosanna-Tabor*, 132 S. Ct. at 709.

2

No. 11-51151

moved to dismiss on the basis that the ministerial exception barred Cannata's suit. Their first motion was denied by the district court because it concluded that not enough evidence had been developed to determine whether the ministerial exception applied. After further discovery, Appellees refiled their motion to dismiss and also moved for summary judgment. The district court granted Appellees' second motion to dismiss for lack of subject matter jurisdiction. Cannata timely appealed.

## STANDARD OF REVIEW

The district court granted Appellees' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), which was considered appropriate under the law at the time. *See McClure v. Salvation Army*, 460 F.2d 553, 556 (5th Cir. 1972). However, in *Hosanna-Tabor*, the Supreme Court ruled that "the [ministerial] exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." 132 S. Ct. at 709 n.4.[2] Thus, although unclear at the time, the district court should have analyzed Appellees' motion to dismiss under Rule 12(b)(6).

Nonetheless, our review requires us to scrutinize the same materials we would have considered were the case properly before us on a 12(b)(1) motion. This case has been amply briefed and was disposed of after extensive discovery. Because the ministerial exception is not a jurisdictional bar and "because the court considered material outside the pleadings in deciding the motion, 'it should have converted the . . . motion for dismissal into a Rule 56 motion for summary

---

[2] Prior to *Hosanna-Tabor*, the First, Third, Tenth, and Ninth Circuits had treated the ministerial exception as an affirmative defense under Federal Rule of Civil Procedure 12(b)(6), the Sixth and Seventh Circuits had treated it as a jurisdictional defect under Rule 12(b)(1), and this circuit as well as the Eleventh Circuit had treated it as permitting courts to construe anti-discrimination laws so as not to apply to claims between ministers and their churches. *See EEOC v. Hosanna-Tabor Evangelical Lutheran Church & Sch.*, 597 F.3d 769, 775 (6th Cir. 2010), *rev'd* 132 S. Ct. 694 (2012) (collecting cases).

No. 11-51151

judgment.'"[3] *See Triplett v. Heckler*, 767 F.2d 210, 212 (5th Cir. 1985) (applying summary-judgment standard in reviewing the district court's dismissal in which the lower court erroneously considered a limitations defense to be a jurisdictional bar). Therefore, "we must scrutinize the record to determine whether it raises a genuine issue of material fact regarding the [affirmative defense.]" *Id.*

"We review a district court's grant of summary judgment *de novo*." *Estate of Bradley ex rel. Sample v. Royal Surplus Lines Ins. Co.*, 647 F.3d 524, 528 (5th Cir. 2011). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is then up to the nonmoving party, going beyond the pleadings, to point to "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). We examine the evidence in the light most favorable to the nonmoving party, *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010), and draw any reasonable inferences in favor of that party, *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003).

## DISCUSSION

### A.

#### 1.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend I. The Supreme Court has recognized the right of religious

---

[3] Given the nature of the ministerial exception, we suspect that only in the rarest of circumstances would dismissal under Rule 12(b)(6)—in other words, based solely on the pleadings—be warranted.

No. 11-51151

organizations to control their internal affairs. *See Watson v. Jones*, 80 U.S. 679, 727 (1872). This right includes the freedom "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine," *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952), and the right of religious organizations to select their own leaders, *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724-25 (1976). Pursuant to this case law, the courts of appeals "uniformly recognized the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of [employment discrimination] legislation to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor*, 132 S. Ct. at 705 & n.2 (collecting cases). In *Hosanna-Tabor*, a unanimous Supreme Court, addressing the issue for the first time, "agree[d] that there is such a ministerial exception." *Id.* at 706.

2.

The Court held that the "Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." *Id.* at 702. The Courts that:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Id.* at 706.

Having confirmed the existence of the ministerial exception, the Court determined that, under the circumstances of the case, it barred an employment-

discrimination suit by a "called" teacher, Cheryl Perich, against the church that had terminated her. *Id.* at 707. Although the Court agreed that the exception "is not limited to the head of a religious congregation," it eschewed a "rigid formula" in determining when an employee is a minister within the meaning of the ministerial exception. *Id.*

In applying the ministerial exception to Perich's suit, the Court first noted that the church had held out Perich as a minister, giving her a distinct role from that of most church members and issuing her a "diploma of vocation" that accorded her the title of "Minister of Religion, Commissioned." *Id.* Second, the Court observed that "Perich's title as minister reflected a significant degree of religious training followed by a formal process of commissioning." *Id.* Perich took six years to fulfill the training requirements and was elected by a vote of the congregation. *Id.* Third, the Court reasoned that Perich held herself out as a minister. *Id.* She accepted the formal call to religious service, claimed a special housing allowance available only to those "in the exercise of the ministry," and, following her termination, wrote in a letter that she regarded herself as a minister. *Id.* at 707-08. Finally, the Court underscored that "Perich's job duties reflected a role in conveying the Church's message and carrying out its mission." *Id.* at 708. Perich taught her students religion four times per week and led them in prayer three times per day, took students to the school chapel service once per week, led the service twice per year, and led her fourth graders in brief devotional exercises every morning. *Id.* Thus, "[i]n light of these considerations—the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church—[the Court] conclude[d] that Perich was a minister covered by the ministerial exception." *Id.*

The Court faulted the Sixth Circuit for committing three errors in concluding that the ministerial exception did not bar Perich's suit. *Id.* First, the

No. 11-51151

Court criticized the lower court for failing to see any relevance in Perich's status as a commissioned minister. *Id.* "Although such a title, by itself, does not automatically ensure coverage," the Court wrote, "that an employee has been ordained or commissioned as a minister is surely relevant, as is the fact that significant religious training and a recognized religious mission underlie the description of the employee's position." *Id.* Second, the Court explained that the lower court had placed too much weight on the fact that lay teachers perform the same duties as called teachers. *Id.* "[T]hough relevant, it cannot be dispositive that others not formally recognized as ministers by the church perform the same functions—particularly when, as here, they did so only because commissioned ministers were unavailable." *Id.* Third, the Court criticized the lower court for unduly emphasizing the secular duties Perich performed. *Id.* Although Perich only performed religious activities for roughly 45 minutes of each day, the Court rejected a rule wherein only those with *exclusively* religious functions fall under the ministerial exception. *Id.* at 708-09. "The heads of congregations themselves often have a mix of duties," the Court pointed out, "including secular ones such as helping to manage the congregation's finances, supervising purely secular personnel, and overseeing the upkeep of facilities." *Id.* at 709. Thus, "the relative amount of time [an employee] spen[ds] performing religious functions" may not be "largely determinative" because the ministerial exception's application "is not one that can be resolved by a stopwatch." *Id.* Thus, "[t]he amount of time an employee spends on particular activities is relevant in assessing that employee's status, but that factor cannot be considered in isolation, without regard to the nature of the religious functions performed and the other considerations discussed." *Id.*

"Because Perich was a minister within the meaning of the exception," the Court ruled that "the First Amendment requires dismissal of [her] employment discrimination suit against her religious employer." *Id.* Neither an order of

No. 11-51151

reinstatement, which would "require[] the Church to accept a minister it did not want," nor damages, which "would operate as a penalty on the Church for terminating an unwanted minister," could be tolerated under the First Amendment. *Id.*

The Court also rejected the argument that the church's asserted reason for terminating Perich—that she violated the church's commitment to resolving disputes internally—was mere pretext. *Id.* According to the Court, the decision to select and control ministers belongs to the church alone. *Id.* Thus, it is immaterial if the reason for termination is not religious, but rather pretextual. *Id.*; *see also id.* at 715 (Alito, J., concurring) ("[W]hatever the truth of [the pretext inquiry], the mere adjudication of such questions would pose grave problems for religious autonomy: It would require calling witnesses to testify about the importance and priority of the religious doctrine in question, with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission.").

3.

The Supreme Court specifically declined to adopt a "rigid formula" for determining when an employee is a minister within the meaning of the ministerial exception, concluding instead "that the exception covers Perich, given all the circumstances of her employment." *Id.* at 707 (majority opinion). However, Justices Thomas and Alito each concurred separately to attempt to elucidate the application of the ministerial exception. *See id.* at 710-11 (Thomas, J., concurring); 711-16 (Alito, J., concurring).

In Justice Thomas's view, the ministerial exception requires deference "to a religious organization's good-faith understanding of who qualifies as its minister." *Id.* at 710 (Thomas, J., concurring). According to Justice Thomas:

> The question whether an employee is a minister is itself religious in nature, and the answer will vary widely. Judicial attempts to

8

No. 11-51151

fashion a civil definition of "minister" through a bright-line test or multi-factor analysis risk disadvantaging those religious groups whose beliefs, practices, and membership are outside of the 'mainstream' or unpalatable to some. Moreover, uncertainty about whether its ministerial designation will be rejected, and a corresponding fear of liability, may cause a religious group to conform its beliefs and practices regarding 'ministers' to the prevailing secular understanding.

*Id.* at 710-11. Thus, for Justice Thomas, the critical question is whether the religious group sincerely considered the plaintiff a minister. *Id.* at 711.

Justice Alito, joined by Justice Kagan, wrote separately to highlight to what extent "formal ordination and designation as a 'minister' [should factor into] determining whether an 'employee' of a religious group falls within the . . . 'ministerial' exception." *Id.* at 711 (Alito, J., concurring) (footnote omitted). Because of the religious diversity in the United States, Justice Alito argued that "it would be a mistake if the term 'minister' or the concept of ordination were viewed as central to the important issue of religious autonomy that is presented in" ministerial exception cases. *Id.*[4] Instead, Justice Alito reasoned, "courts should focus on the function performed by persons who work for religious bodies." *Id.* He stated that:

> The First Amendment protects the freedom of religious groups to engage in certain key religious activities, including the conducting of worship services and other religious ceremonies and rituals, as well as the critical process of communicating the faith. Accordingly, religious groups must be free to choose the personnel who are essential to the performance of these functions.
> The "ministerial" exception should be tailored to this purpose. It should apply to any "employee" who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith. If a religious group believes that the ability of such an employee to perform these key functions has been compromised,

---

[4] Justice Alito reasoned that although the title "minister" is relevant to the analysis, "such a title is neither necessary nor sufficient." *Id.* at 713.

then the constitutional guarantee of religious freedom protects the group's right to remove the employee from his or her position.

*Id.* at 711-12.

The ministerial exception, Justice Alito wrote, requires religious organizations be free "to determine who is qualified to serve in positions of substantial religious importance." *Id.* at 712. Although this will vary from religion to religion, he reasoned that "it is nonetheless possible to identify a general category of 'employees' whose functions are essential to the independence of practically all religious groups": those in leadership positions, those who perform important functions during worship services, religious ceremonies, and rituals, and those responsible for teaching or conveying religious tenets to the next generation. *Id.* Accordingly, because Perich "played an important role as an instrument of her church's religious message and as a leader of its worship activities," the ministerial exception left it to the church to decide whether Perich should remain in her position. *Id.* at 715.

### B.

Prior to *Hosanna-Tabor*, we had articulated a three-factor test for determining when an employee qualifies as a minister within the meaning of the ministerial exception:

> First, this court must consider whether employment decisions regarding the position at issue are made largely on religious criteria[.] . . . Second, to constitute a minister for purposes of the "ministerial exception," the court must consider whether the plaintiff was qualified and authorized to perform the ceremonies of the Church. . . . Third, and probably most important, is whether [the employee] engaged in activities traditionally considered ecclesiastical or religious, including whether the plaintiff attends to the religious needs of the faithful.

*Starkman v. Evans*, 198 F.3d 173, 176 (5th Cir. 1999) (internal quotation marks and citations omitted).

No. 11-51151

This appeal presents the first occasion for this circuit to determine when an employee is a minister within the meaning of the ministerial exception in light of *Hosanna-Tabor*. Recognizing this, the court asked Professor Leslie C. Griffin, a professor of constitutional law at the University of Houston Law Center who specializes in the First Amendment's Religion Clauses, to address the continued validity of the *Starkman* test. Several religious organizations also submitted an amicus brief addressing this issue, and both Cannata and the church responded.

Reviewing the arguments advanced by the parties and their amici, we conclude that the Supreme Court's decision in *Hosanna-Tabor* at most invalidates and at least modifies *Starkman*'s three-part test. As Professor Griffin correctly observes, the *Hosanna-Tabor* Court engaged in a fact-intensive inquiry and explicitly rejected the adoption of a "rigid formula" or bright-line test. *See* 132 S. Ct. at 707. In light of this, *Starkman*'s three-part test cannot survive in its precise form. First, given the totality-of-the-circumstances analysis in which the *Hosanna-Tabor* Court engaged, limiting the inquiry in ministerial exception cases to a three-part test is invalid. As Professor Griffin correctly notes, some of the facts the *Hosanna-Tabor* Court underscored may not be able to be considered under *Starkman*'s three prongs, which would not be permissible. Second, because the Supreme Court eschewed a "rigid formula" in favor of an all-things-considered approach, courts may not emphasize any one factor at the expense of other factors. Thus, *Starkman*'s "most important" factor—whether the plaintiff "engaged in activities traditionally considered ecclesiastical or religious," 198 F.3d at 176—may no longer serve as the gravamen of a ministerial exception case. However, this is not to place too great an emphasis on *Hosanna-Tabor*. Any attempt to calcify the particular considerations that motivated the Court in *Hosanna-Tabor* into a "rigid formula" would not be appropriate. *See Hosanna-Tabor*, 132 S. Ct. at 707.

No. 11-51151

We are mindful of the benefit that clear standards provide to lower courts and religious employers seeking to structure their actions in accordance with the law. *Cf. id.* at 711 (Thomas, J., concurring) ("[U]ncertainty about whether its ministerial designation will be rejected, and a corresponding fear of liability, may cause a religious group to conform its beliefs and practices regarding 'ministers' to the prevailing secular understanding."). However, *Hosanna-Tabor*'s rejection of a bright-line test likely reflects the diversity of religious practice in this country; given the pluralism of religious thought for which America is known and celebrated, it may not be possible to develop a one-size-fits-all approach to the ministerial exception. *See id.* (Alito, J., concurring) ("Because virtually every religion in the world is represented in the population of the United States, it would be a mistake if the term 'minister' or the concept of ordination were viewed as central to the important issue of religious autonomy that is presented in cases like this one."). Following the example of the *Hosanna-Tabor* Court, it is enough for us to conclude that, under the circumstances, Cannata falls within the ministerial exception.

## C.

The crux of Cannata's argument is that he merely played the piano at Mass and that his only responsibilities were keeping the books, running the sound system, and doing custodial work, none of which was religious in nature. However, the performance of secular duties, the Supreme Court has said, may not be overemphasized in the context of the ministerial exception. *See Hosanna-Tabor*, 132 S. Ct. at 709.

Appellees' argument, meanwhile, centers on the important role music plays in the celebration of Mass.[5] Appellees introduced evidence that all

---

[5] For example, the church, pointing to materials prepared by the United States Conference of Catholic Bishops and intended to aid in the preparation and celebration of the liturgy as well as the affidavits of Cheryl Maxwell, Director of the Office of Worship of the

No. 11-51151

musicians, regardless of whether they are professional or volunteer or work full-or part-time, "exercise a genuine liturgical ministry," meaning that they "work[] in collaboration with the parish pastor in carrying out the Church's mission by participating in the threefold ministry of Christ." In particular, Appellees produced evidence that the Music Director provides a major service by overseeing the planning and coordination of the church's music program, fostering the active participation of the "liturgical assembly" in singing, and promoting the various musicians—choir members, psalmists, cantors, and organists—all of whom play instruments in service of the liturgy. Thus, the person who leads the music during Mass is an integral part of Mass and "a lay liturgical minister actively participating in the sacrament of the Eucharist."

As previously noted, the *Hosanna-Tabor* Court eschewed a "rigid formula" and the application of a bright-line test in ministerial exception cases. *See* 132 S. Ct. at 707. Application of the exception, however, does not depend on a finding that Cannata satisfies the same considerations that motivated the Court to find that Perich was a minister within the meaning of the exception. Rather, it is enough to note that there is no genuine dispute that Cannata played an integral role in the celebration of Mass and that by playing the piano during services, Cannata furthered the mission of the church and helped convey its message to the congregants. *See id.* at 708; *id.* at 712 (Alito, J., concurring) (reasoning that "[employees] who perform important functions in worship services and in the performance of religious ceremonies and rituals" fall within

---

Diocese of Austin, and Father Wahl, an ordained Catholic priest and expert on Canon law, states that: "The Church believes that music in the liturgy is sacred and has ritual and spiritual dimensions. Music enhances the prayer that occurs in the Catholic Mass by enriching its elements. It also draws the congregation closer to Christ, and allows the congregation to act together in celebration by singing praises and hymns to the Lord, which in turn strengthens the faith that is in them. Music is a part of the celebration and prayer that is occurring at the Mass and enhances the liturgy."

No. 11-51151

the ministerial exception).  Accordingly, we conclude that Cannata falls within the ministerial exception and that the exception therefore bars his suit.

1.

Cannata disputes the Magistrate Judge's determination, based on the affidavit of Father Richard Wahl that the Music Director is a worship leader in the church.  Cannata disagrees, arguing that he had no training, education, or experience necessary to be considered a worship leader, had no direct interaction with the congregation, and was not at the church during the day.  Moreover, Cannata argues that he never led the music at Mass, led the congregation in song, or sang himself.  Instead, Cannata insists that he sat at the piano, facing away from the congregation and out of sight of the cantors.

Appellees disagree and point to evidence in support of their arguments. Relying on Cannata's own deposition, Appellees introduced evidence that Cannata performed the music at Mass on Saturday nights and Sunday mornings and that he and his wife selected the hymns to be played at Mass each Sunday. By his own admission, Cannata did not coordinate his musical selections with the priest.  Appellees also pointed to evidence (from the complaint) that Cannata boasted of his role in building one of the best music programs in the diocese and training a "large number" of cantors.  Furthermore, according to his own deposition testimony, Cannata also led and accompanied the choir at practice, going over the music with them and teaching them every Tuesday.

Because he made unilateral, important decisions regarding the musical direction at Mass, the church considered him a minister.  Even if this were not enough, Cannata played the piano at Mass.  As previously noted, undisputed evidence indicates that music is an integral part of the celebration of Mass. Consequently, Cannata played an important role in furthering the service and therefore helped convey the church's message and carry out its mission.

2.

No. 11-51151

According to Cannata, he was not ordained and he did not conduct Mass, deliver a sermon, or write the music or lyrics for the ceremony.  Rather, he lacked the education, training, and experience to be considered a minister.  Therefore, Cannata argues, the district court erred because it failed to find any relevance in his lack of religious training and his ostensibly purely-secular duties.

Appellees counter by noting that Cannata's responsibilities were specifically oriented toward helping the church carry out the celebration of Mass.  By Cannata's own admission, these duties included working on the music department budget, managing the sound system, running the soundboard during Mass, maintaining the music room, rehearsing with choir members and cantors, and playing piano during services.  Furthermore, Cannata and his wife "arranged for all the music" while he was on vacation, and he was asked for a list of hymns from the "liturgy planning guide" appropriate for weekend masses on his return.  Consequently, Appellees looked to him for guidance in coordinating Mass.

Appellees also correctly note that Cannata's lack of formal training in Catholic doctrine is immaterial; this is because the ministerial exception does not apply only to those who are ordained.  *See Hosana-Tabor*, 132 S. Ct. at 711 (Alito, J., concurring).  Moreover, Appellees introduced evidence, prepared by the United States Conference of Catholic Bishops and intended to aid in the preparation and celebration of the liturgy, that "as a matter of both religious belief and canon law, the Church considers music in the liturgy to be sacred, with ritual and spiritual dimensions; and a church musician to be a minister who shares faith, serves the community, and expresses the love of God and neighbor through music."  For Appellees, the argument is simple: Mass is the center of the Catholic faith, and Cannata was at the center of Mass.  According to Father Wahl, Cannata "drew the congregation closer to Christ, and allowed

15

the congregation to act together in celebration by singing praises and hymns to the Lord, which in turn strengthens the faith that is in them."

The *Hosanna-Tabor* Court observed that "[t]he heads of congregations themselves often have a mix of duties, including secular ones, such as helping to manage the congregation's finances, supervising purely secular personnel, and overseeing the upkeep of facilities." 132 S. Ct. at 709. Accordingly, that Cannata lacked the religious training present in *Hosanna-Tabor* is insufficient to insulate him from the application of the ministerial exception, particularly in light of the important part his ostensibly secular duties—working on the music department budget, managing the sound system, running the soundboard during Mass, maintaining the music room, rehearsing with choir members and cantors, and playing piano during services—played in furthering the mission and message of the church at Mass.

3.

Finally, Cannata disputes—and attempts to discredit—the expert testimony of Father Wahl and the testimony of Cheryl Maxwell. In particular, Cannata argues that he could not have been a minister according to canon law, as Father Wahl testified, because he failed to satisfy the three requirements necessary to become a lay ecclesial minister. He makes the same argument with respect to Maxwell—who stated that the church considers the person who leads the music to be an integral part of the celebration of Mass and a lay liturgical minister—because the church, according to Cannata, previously hired an openly gay Music Director and Music Directors at other churches within the Diocese who were not Catholic.

We find Cannata's attempts to impeach, and therefore discredit, the testimony given by Father Wahl and Maxwell unpersuasive. First, Cannata did not supply any expert testimony of his own (apart from his interpretations of a text that allegedly details the criteria for becoming a lay ecclesial minister) and,

as he himself has acknowledged, he lacks expertise in canon law.  Second, Cannata concedes that "the intent of the ministerial exception is to allow religious organizations to . . . adhere to their own religious interpretations." Therefore, it is not for a court to say whom the Catholic Church may consider a lay ecclesial minister notwithstanding Cannata's attempts to impeach the church's own doctrine.  Rather, the ministerial exception permits the church to pick its own ministers and do so using its own criteria.  Third, Cannata's argument, in essence, is a challenge to Catholic Church doctrine and precisely the kind of challenge the Supreme Court concluded that government is foreclosed from deciding by the Religion Clauses.  *See* 132 S. Ct. at 710 (Thomas, J., concurring) (reasoning that because "[t]he question whether an employee is a minister is itself religious in nature, and the answer will vary widely," courts must "defer to a religious organization's good-faith understanding of who qualifies as its minister").  The *Hosanna-Tabor* Court refused to scrutinize the church's decision, in that case, to terminate Perich because she failed to abide by her church's teachings regarding internal dispute resolution because that would impermissibly permit the state to second-guess church doctrine.  *See id.* at 709 (majority opinion); *id.* at 715 (Alito, J., concurring) ("[T]he mere adjudication of such questions would pose grave problems for religious autonomy: It would require calling witness to testify about the importance and priority of the religious doctrine in question, with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission.").  Likewise, we may not second-guess whom the Catholic Church may consider a lay liturgical minister under canon law.  Accordingly, Cannata's disputes with the testimony of Father Wahl and Maxwell are without merit.

* * *

No. 11-51151

As Appellees correctly observe, the church has the right to determine who will participate in its religious ceremonies. Even assuming Cannata was "merely" an accompanist, Appellees have established the importance of music to the celebration of Mass and Cannata's role in the service. Because Cannata performed an important function during the service, there is no genuine dispute that he played a role in furthering the mission of the church and conveying its message to its congregants. Accordingly, we conclude that Appellees have established that the ministerial exception applies and therefore bars Cannata's suit from proceeding further.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.