[Cite as *Fisher v. Archdiocese of Cincinnati*, 2014-Ohio-944.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| VICKIE FISHER, | : | APPEAL NO. C-130295 |
| | | TRIAL NO. A-1108451 |
| Plaintiff-Appellant, | : | |
| vs. | : | *O P I N I O N.* |
| ARCHDIOCESE OF CINCINNATI, | : | |
| Defendant-Appellee. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 14, 2014

*Freking and Betz LLC*, *Randolph H. Freking* and *Brian P. Gillan*, for Plaintiff-Appellant,

*Graydon Head and Ritchey, LLP, Steven P. Goodin* and *Nicholas J. Ziepfel*, for Defendant-Appellee.

Please note: this case has been removed from the accelerated calendar.

**FISCHER, Judge.**

{¶1}   Following her termination from employment, plaintiff-appellant Vickie Fisher filed suit against her former employer defendant-appellee the Archdiocese of Cincinnati ("Archdiocese"), asserting claims for age discrimination, promissory estoppel, and intentional infliction of emotional distress.  The trial court dismissed her claims based upon the ministerial exception, which is rooted in the First Amendment's Free Exercise and Establishment Clauses, and bars employment-discrimination suits by ministerial employees against their religious employers.  *See Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, ___U.S.___, 132 S.Ct. 694, 702-709, 181 L.Ed.2d 650 (2012).  It also dismissed her claims on a second basis, the ecclesiastical abstention doctrine, finding that its "inquiry into and second-guessing of the human resources decisions of church-affiliated organizations [would] offend the First Amendment's plain language regarding the separation of church and state."

{¶2}   Fisher's appeal presents the first opportunity for this court to address the ministerial exception in light of the United States Supreme Court's decision in *Hosanna-Tabor*.  Based upon our review of the record and the law, we conclude that there is no genuine issue of material fact that Fisher was a ministerial employee, and that her claims are barred under the ecclesiastical abstention doctrine.  We, therefore, affirm the trial court's decision granting summary judgment to the Archdiocese.

### *Fisher's Employment with the Archdiocese*

{¶3}   Fisher, a practicing Catholic, was employed at the Gate of Heaven Cemetery for nearly two decades.  The cemetery is wholly-owned and operated by the Archdiocese.  It is a manifestly religious institution established for the sacred purpose of carrying out the liturgical rite of Catholic burial and the subsequent care of the burial spaces.  The Catechism of the Catholic Church provides that "the Christian funeral is

a liturgical celebration of the Church. The ministry of the Church in this instance aims at expressing efficacious communion with the deceased, in the participation in that communion of the community gathered for the funeral, and the proclamation of eternal life to the community." Catechism of the Catholic Church Section 1684. In the eyes of the Catholic Church, "the burial of the dead is a corporal work of mercy; it honors the children of God, who are temples of the Holy Spirit." *Id.* at Section 2300.

{¶4} When Fisher began her employment at the cemetery in 1989, she received a copy of the Gate of Heaven Cemetery Employee Handbook. In addition to identifying all employees as at-will employees, the handbook sets forth the unique mission of the Catholic cemetery, the management of which requires special sensitivities to the customs and rites of Catholic religious practice. This mission statement was also posted on Fisher's office wall.

{¶5} The mission statement provides that employees must:

* * * acknowledge that the Catholic cemetery is established to carry out the sacred religious function of the burial, and care for the resting places, of the deceased members of the Church.

* * * accept the responsibility of implementing this religious function under the directions and supervision of the Archbishop of the Catholic Archdiocese of Cincinnati.

* * * believe in, and [be] firmly committed to, the teachings and rich tradition of the Catholic Church with regard to its deceased members, and the sacredness of the cemeteries in which their bodies rest.

* * * recognize the deep religious significance of the Corporal Work of Mercy involved in the burial of the dead, and reverence for the deceased.

* * * [be] dedicated to the respectful care of the people of God who, even in death, remain a part of the whole Christian community.

* * * [be] committed to encouraging Catholic prayer and devotion for our deceased brothers and sisters, especially within our Catholic cemetery.

* * * oppose any effort to minimize or destroy any of the Catholic teachings which relate to death, burial and devotion to departed souls.

* * * proclaim through our words, work, and example the sacredness of the Human Body, the Belief in the Resurrection and the Christian Virtue of Hope.

{¶6}     Fisher started her employment as a Family Service Counselor/Special Projects Coordinator/Funeral Escort. The written job description for the position provides that the employee "have a special sensitivity to the mission of the Catholic cemetery and safeguard the values and ethics of same." Fisher sold burial services, coordinated special cemetery events, including Memorial Day Mass, Candlelight Services, Children's Services, and was responsible for the conduct of funeral services held within the cemetery's chapel or on its grounds. Fisher told families that she was Catholic and was familiar with the Catholic burial service.

{¶7}     Fisher also received faith-based training for the position. The Archdiocese paid for Fisher to attend a four-year program in Catholic cemetery management at John Carroll University. The classes, which were presented by the National Conference of Catholic Cemeteries, required a one-week residency each year with full days of coursework in human resources and land management, as well as spirituality and the psychology of death and dying. The courses were provided from a Catholic theological perspective. Fisher earned a certificate for her completion of the course during her employment at the Gate of Heaven Cemetery.

4

{¶8}     In 2005, Fisher was promoted to the newly-created position of codirector of the cemetery along with another employee, Paula Rooks.  In her capacity as codirector, Fisher gathered with the Gate of Heaven staff every morning and began the day with a prayer.  She routinely interacted with Catholic priests in order to deliver the proper burial rites and service.  She also assisted grieving families and provided them with spiritual guidance through the burial process.  Fisher described her role as primarily dealing with people and the family service aspect of a burial.  She viewed the faith aspect of her position as significant to her duties and held a sense of mission, describing the work of the cemetery, itself, as a ministry.  Conversely, her codirector Rooks was viewed as the business manager of the cemetery with a focus on information-technology issues.

{¶9}     In the fall of 2010, Richard Kelly, the Chief Financial Officer for the Archdiocese, received a complaint from a cemetery employee that the Gate of Heaven Cemetery was being mismanaged.  The employee had alleged that Fisher and Rooks were involved in selling damaged grave markers for scrap metal and distributing the cash proceeds to Gate of Heaven employees.  A subsequent investigation affirmed the grave-marker allegation and revealed that Fisher was using profanity with the employees.  Fisher and her codirector, Rooks, were reprimanded.

{¶10}   Kelly ultimately decided that the cemetery needed new management.  During Fisher's and Rooks' tenure as codirectors, the cemetery had acquired significant negative equity.  Sales were lackluster and an auditor had expressed concern about the financial health of the cemetery.

{¶11}   Kelly decided that the cemetery would operate better under a single on-site manager, who had more substantive business credentials. He contacted Human Resources Director William Hancock, and asked him to create a job description for the

position that reflected these requirements. Hancock reformulated the job description to require an advanced decree and greater business experience. The Archdiocese's ad for the newly created executive director position was posted on the intranet for current employees, as well in the Catholic Telegraph, a newspaper published by the Archdiocese, and other local newspaper and industry specific journals.

{¶12} Fisher applied for the new position, emphasizing the spiritual aspects of her Gate of Heaven position: "I got the most satisfaction personally and spiritually from my current position * * * Assisting those in pain is personally very fulfilling." The Archdiocese eventually hired Debra Crane as the new executive director of the cemetery. Crane was an experienced attorney and manager, who possessed extensive experience turning around underperforming businesses. She was also a deeply spiritual woman, who had left her prior position as general counsel for an insurance company to serve as a pastor at a nondenominational church.

{¶13} In January 2011, Kelly informed Fisher and Rooks that Crane had been hired as the new director. Fisher believed that Crane, a non-Catholic, could not handle the "faith part of the job." She was equally concerned with what the hiring of a non-Catholic would mean for the future of the cemetery. In June 2011, Fisher's position and several other employees' positions were eliminated as a result of Crane's decision to restructure the Gate of Heaven sales force.

### Trial Court Proceedings

{¶14} In October 2011, Fisher filed suit against the Archdiocese alleging age discrimination, promissory estoppel, and intentional infliction of emotional distress. In December 2011, the trial court stayed the case pending a ruling from the United States Supreme Court in *Hosanna-Tabor*. One week after the Supreme Court's ruling in

*Hosanna-Tabor*, the trial court lifted the stay. The Archdiocese then moved pursuant to Civ.R. 56 for summary judgment on all of Fisher's claims.

{¶15} On May 4, 2013, the trial court granted the Archdiocese summary judgment on two separate grounds. First, the trial court held that "there is no genuine issue of material fact that Fisher is a 'ministerial employee' as defined by the United States Supreme Court's ruling in *Hosanna-Tabor*, given that her training and job duties at the Gate of Heaven Cemetery expressly involved religious doctrine and practices, and her role is 'ministerial.' " Second, the trial court found that "separate and apart from the 'ministerial exception' * * * judicial inquiry into and second-guessing of the human resources decisions of church-affiliated organizations offends the First Amendment's plain language regarding the separation of church and state." As a result, it "saw no role for itself under these circumstances as a matter of law," and dismissed all of Fisher's claims. Fisher has timely appealed.

### Summary Judgment Standard

{¶16} In a single assignment of error, Fisher argues that the trial court erred in granting the Archdiocese summary judgment. We review a trial court's grant of summary judgment under Civ.R. 56 de novo. *Esber Beverage Co. v. LaBatt USA Operating Co., L.L.C.*, ___Ohio St.3d ___, 2013-Ohio-4544, ___N.E.2d ___,¶ 9. Under Civ.R. 56(C), summary judgment is proper when

> (1) [n]o genuine issue as to any material fact remains to be litigated;
> (2) the moving party is entitled to judgment as a matter of law; and (3)
> it appears from the evidence that reasonable minds can come to but
> one conclusion, and viewing such evidence most strongly in favor of
> the party against whom the motion for summary judgment is made,
> the conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1997).

### *The Ministerial Exception*

{¶17}   The Free Exercise and Establishment Clauses provide that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." The First Amendment to the U.S. Constitution.   Lower federal courts interpreting these clauses have long recognized a ministerial exception that is grounded in the First Amendment and "bar[s] the government from interfering with the decision of a religious group to fire one of its ministers." *Hosanna-Tabor*, 132 S.Ct. at 702, 705, 181 L.Ed.2d 650.

{¶18}   In *Hosanna-Tabor*, the United States Supreme Court affirmed the exception and clarified "that the [ministerial] exception operates as an affirmative defense to an otherwise cognizable claim, [instead of] a jurisdictional bar." *Id.* at 706, 709 at fn.4.  The Supreme Court then examined whether the exception applied to an employee who had performed mixed secular and ministerial duties. *Id.* at 709. The plaintiff in Hosanna-Tabor, Cheryl Perich, was a "called" teacher at a school operated by Hosanna-Tabor Evangelical Lutheran Church and School ("Hosanna-Tabor"), "a member congregation of the Lutheran Church-Missouri Synod, the second largest Lutheran denomination in America." *Id.* at 699.  Teachers at Hosanna-Tabor were classified as either "called" or "lay" teachers.  Both performed the same duties, but " 'called' teachers [we]re regarded as having been called to their vocation by God through the congregation." *Id.*

{¶19}   Perich began her employment as a lay teacher, but was later asked to become a called teacher.  *Id.* at 700.  She accepted and "received a 'diploma vocation,' designating her as a commissioned minister." *Id.*  Sometime later, she became ill, was diagnosed with narcolepsy, and eventually terminated.  *Id.*  When the

8

EEOC sought to bring a claim on her behalf under the Americans with Disabilities Act, the parties disputed whether the claim was barred by the ministerial exception. *Id.*

{¶20} In determining whether the ministerial exception applied, the Supreme Court expressly stated that "the ministerial exception is not limited to the head of a religious congregation." *Id.* at 707. The court, however, refrained from "adopt[ing] a rigid formula for deciding when an employee qualifies as a minister," instead choosing to examine the circumstances of Perich's employment to determine if the exception applied. *Id.*

{¶21} In performing its examination, the court noted that Perich held the title of "Minister of Religion, Commissioned" and performed some ministerial duties in the course of her employment. *Id.* at 707. The court commented that "although such a title, by itself, does not automatically ensure coverage, the fact that an employee has been ordained or commissioned as a minister is surely relevant, as is the fact that a significant religious training and a recognized religious mission underlie the description of the employee's position." *Id.* at 710.

{¶22} The court also examined Hosanna-Tabor's treatment of Perich. It found that the school had "held [her] out as a minister with a role distinct from that of most of its members." *Id.* at 707. It also examined how Perich had presented herself. It found that Perich had "held herself out as a minister of the church by accepting the formal call to religious service," by claiming a housing tax exemption available only for ministers, and by referring to herself as a minister. *Id.* at 707-708.

{¶23} After examining the circumstances of Perich's employment, the court found that Perich's job duties "reflected a role in conveying the Church's message and carrying out its mission." *Id.* at 708. The Supreme Court held that the

9

ministerial exception applied, even though Perich had performed mixed ministerial and secular functions, and the ministerial duties had consumed only a small amount of her time—approximately 45 minutes a day. *Id.* Finally, the court noted that "though relevant, it cannot be dispositive that others not formally recognized as ministers by the church can perform the same functions." *Id.* at 708.

{¶24} The court, however, stated that it was "express[ing] no view on whether someone with Perich's duties would be covered by the ministerial exception in the absence of other considerations [it] had discussed," nor was it expressing any "view on whether the ministerial exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their employers." *Id.* at 708, 710. The court concluded that there would be "time enough to address the applicability of the exception to other circumstances, if and when they ar[o]se." *Id.* at 710.

{¶25} Justices Thomas and Alito wrote separate concurring opinions. Justice Kagan joined Justice Alito's concurrence. Justice Thomas agreed with the majority's decision to eschew a bright-line test or multi-factor analysis, noting that "whether an employee is a minister is itself religious in nature and the answer will vary widely." *Id.* at 710-711 (Thomas, J., concurring). He was concerned that attempts to formulate such a test would "risk disadvantaging those religious groups whose beliefs, practices, and membership are 'outside of the mainstream' or unpalatable to some." *Id.* at 711. He found Hosanna-Tabor's sincere belief that Perich was a minister sufficient for him to conclude her suit properly barred by the ministerial exception. *Id.*

{¶26} Justice Alito, who was joined by Justice Kagan, wrote separately to "clarify his understanding of the significance of formal ordination and designation as a 'minister' in determining whether an employee of a religious group falls within the

ministerial exception." *Id.* at 711 (Alito, J., concurring). He noted that "[t]he First Amendment protects the freedom of religious groups to engage in certain key religious activities, including the conducting of worship services and other religious ceremonies and rituals, as well as the critical process of communicating the faith. Accordingly religious groups must be free to choose the personnel who are essential to the performance of these functions." *Id.* at 712.

{¶27} Justice Alito urged courts to focus upon these key functions performed by the persons who work for religious institutions when determining whether the ministerial exception applies. In his opinion, the ministerial exception should apply to "any employee who leads a religious organization, conducts worship services, or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith." *Id.* at 711-712.

{¶28} Post *Hosanna-Tabor*, federal and state courts have found parochial school teachers, music directors, and seminary professors to be "ministers" under *Hosanna-Tabor's* framework. *See Herzog v. St. Peter Lutheran Church*, 884 F.Supp.2d 668 (N.D.Ill.2012); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 176 (5th Cir.2012); *Kirby v. Theological Seminary*, No. 2010-CA-001798-MR, 2012 Ky.App. Unpub. LEXIS 1007 (July 27, 2012); *Kant v. Theological Seminary*, No. 2011-CA-000004-MR, 2012 Ky. App. Unpub. LEXIS 1014 (July 27, 2012).

{¶29} Fisher argues that the ministerial exception does not apply because her duties at the Gate of Heaven Cemetery were not religious; the Archdiocese did not hold her position out as a religious position; her position required no religious training; and her position did not include conveying the church's message. We disagree.

{¶30} Both the cemetery's mission statement and employee handbook required Fisher to acknowledge "the religious function" that she was performing and the ultimate authority of the Archbishop in such matters. Fisher was responsible for coordinating services in the chapel, working with grieving families, coordinating services with various parishes, and attending grave-site services. She interacted with clergy on a daily basis, and employed her status as a person "of the faith" to console grieving families. Fisher conducted these duties in a liturgical setting replete with religious statuary, photographs of the Pope and Archbishop, and a dispensary for Rosaries.

{¶31} Fisher also underwent multi-year, doctrine-specific training at a Jesuit Catholic University to better perform her job. She was involved in the preparation and performance of religious rituals. As codirector of the cemetery, she served in an indisputable leadership position, acting as the face of the Catholic Church to thousands of grieving families. And like the plaintiff in *Hosanna-Tabor*, she saw herself as part of a larger ministry.

{¶32} Fisher argues that because the Archdiocese replaced her with Crane, who was a non-Catholic, the Archdiocese has conceded that status as a priest or minister or membership in the Catholic Church was not a requirement for the executive director of the cemetery. But Fisher has not cited any authority to support her argument that Crane's duties are relevant to a determination of Fisher's status as a "ministerial" employee. Rather, courts apply an analysis that is personal to the individual plaintiff. *See Hosanna-Tabor,* 132 S.Ct. at 707-710, 181 L.Ed.2d 650, (examining the facts and circumstances of Perich's employment); *see also Cannata*, 700 F.3d at 176 (rejecting plaintiff's argument that his position as a "music director" could not have been a "lay minister position" in the Catholic Church because the

church had previously hired an "openly gay music director" and hired non-Catholic music directors at other churches within the diocese). Even if this court were to consider Crane's duties, the record shows that Crane is serving in a reformulated position—one that now emphasizes business acumen—and therefore, any comparison of Crane's duties would not be dispositive of Fisher's status as a ministerial employee.

{¶33} The Catholic faith, like many other religions, has a focus on "life after death." The Archdiocese introduced evidence that burial rituals and beliefs, as articulated in the Catechism of the Catholic Church, are central to its faith. The cemetery's mission statement and handbook expressly required Fisher to recognize the importance of this "religious function." Fisher's role at the Gate of Heaven Cemetery, moreover, helped further the mission of the Catholic Church in this regard. Because Fisher's job duties, training, and performance during her tenure at the Gate of Heaven Cemetery demonstrate that she was a ministerial employee, the Archdiocese was entitled to summary judgment on Fisher's age-discrimination claim.

{¶34} At oral argument, Fisher argued that the ministerial exception applied only to discrimination claims, and thus, did not bar her promissory-estoppel and intentional-infliction-of-emotional-distress claims. The Supreme Court in *Hosanna-Tabor*, "expresse[d] no view on whether the exception bar[red] other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." 132 S.Ct. at 710, 181 L.Ed.2d 650. Several state courts, however, have applied the ministerial exception to common-law claims, when they stem directly from the individual's employment and are inextricably entangled with the employee's discrimination claim. *See Kant*, No. 2011-CA-000004-MR, 2012

Ky.App. Unpub. LEXIS 1014; *Givens v. St. Adalbert Church*, No. HHDCV1260324595, 2013 Conn. Super. LEXIS 1704 (Conn Super. Ct. July 25, 2013); *DeBruin v. St. Patrick Congregation*, 2012 WI 94, 343 Wis.2d 83, 816 N.W.2d 878. Here, Fisher's remaining claims for promissory estoppel and intentional infliction of emotional distress are inextricably entangled with her age-discrimination claim. As a result, the trial court properly granted summary judgment to the Archdiocese on those claims as well.

### *Ecclesiastical Abstention Doctrine*

**{¶35}** In addition to finding that Fisher was a "ministerial" employee, the trial court also granted summary judgment to the Archdiocese on a separate ground, namely that its adjudication of Fisher's claims would require it to intrude into the Archdiocese's internal affairs.

**{¶36}** In *Watson v. Jones*, 80 U.S. 679, 20 L.Ed. 666 (1872), the United States Supreme Court held that the First Amendment bars the government from interfering in the internal affairs of a church. Several federal and state courts have recognized that *Watson* and its progeny set forth a separate basis for dismissing an employee's claims that is independent from the protections afforded by the ministerial exception. *McCallum v. Billy Graham Evangelistic Assn.*, 824 F.Supp.2d 644 (W.D.N.C.2011); *Weiter v. Kurtz*, No. 2011-CA-001058-MR, 2012 Ky.App. Unpub. LEXIS 937 (Dec. 14, 2012). In Ohio, this exception is commonly referred to as the "ecclesiastical abstention doctrine." *See, e.g., Smith v. White*, 2d Dist. Montgomery No. 25622, 2014-Ohio-130, ¶ 2.

**{¶37}** In *Weiter v. Kurtz*, for example, an at-will bookkeeper/receptionist claimed that she had been wrongfully terminated for opposing the church's reassignment of a priest. *Weiter* at *2-3. While the Kentucky Court of Appeals

concluded that she was not a ministerial employee, it nonetheless dismissed her claims for wrongful termination and outrage on the basis that they involved ecclesiastical concerns and were therefore, not appropriate for the court to determine under the First Amendment. *Id.* at *23.

{¶38} Similarly, here, the resolution of Fisher's claims would invariably interject this court into the Archdiocese's internal affairs. As set forth earlier in paragraphs 3 through 7, and 30 through 34, the manner in which the Archdiocese chooses to carry out its funeral rites clearly falls within the realm of ecclesiastical decision-making. Thus, the Archdiocese was entitled to summary judgment on Fisher's claims for this additional reason. We, therefore, overrule Fisher's sole assignment of error and affirm the trial court's judgment dismissing her claims.

Judgment affirmed.

**DINKELACKER, P.J,** concurs.
**DEWINE, J.,** concurs separately.

**DEWINE, J.,** concurring separately.

{¶39} I agree that the facts of this case amply demonstrate that Ms. Fisher's claims are barred by the First Amendment under what is commonly referred to as the ministerial exception. Accordingly, I concur in judgment and in paragraphs 1-34 of the majority's opinion.

{¶40} I write separately only because I fear that the final paragraphs of the opinion may engender some confusion. The majority affirms the trial court's decision on the "separate ground" that adjudication of the dispute would intrude into the Archdiocese's internal affairs. It bases this "separate ground" on *Watson v. Jones*, 80 U.S. 679, 20 L.Ed. 666 (1872), and its "progeny." But, as the Supreme Court has just recently reminded us, the line of cases delineating the ministerial

15

exception are progeny of *Watson.  Hosana-Tabor Evangelical Lutheran Church and School v. EEOC*, ___U.S.___, 132 S.Ct. 694, 704, 181 L.Ed.2d 650 (2012).  Under the ministerial exception, the state impermissibly interferes with the internal affairs of a church when it dictates who the church may choose as a minister.

{¶41}   The cases the majority cites deal with situations where religious freedom protections apply even where an employee has been found <u>not</u> to be a minister because adjudication of the dispute might nonetheless entangle the courts in matters of church doctrine.  *Weiter v. Kurtz*, No. 2011-CA-001058-MR, 2012 Ky.App. LEXIS 937, *18-19 (Dec. 14, 2012); *McCallum v. Billy Graham Evangelistic Assn.*, 824 F.Supp.2d 644, 651-652 (W.D.N.C.2011).  It is certainly true that the Free Expression and Establishment Clauses allow for autonomy in religious matters in areas that extend beyond the selection of a church's ministers.  But here, having found that Ms. Fisher is a minister for purposes of the exception, there is no need to ponder whether a broader exception might apply to her employment-based claims if she were not a minister.

Please note:
      The court has recorded its own entry this date.