EDITH H. JONES, Circuit Judge:
This is an emergency appeal from an extraordinary discovery order by the district court to a religious body. The court compelled document production of the group's internal communications despite its status as a non-litigant and its voluntary furnishing of substantial discovery materials. Because the trial date looms, and with the benefit of full briefing from both parties, we elect to consolidate the Appellant's motion to stay, along with the Appellees' motion to dismiss this appeal, with a determination of the merits of the discovery order. We REVERSE the court's order denying the Appellant's motion to quash and compelling further document discovery.
BACKGROUND
The Texas Conference of Catholic Bishops ("TCCB") is an unincorporated ecclesiastical association that furthers the religious ministry of the Roman Catholic Bishops and Archbishops in the State of Texas. Catholic Bishops communicate through TCCB to determine how the Catholic Church should address various moral, theological, and social issues, including abortion policy. The Catechism of the Catholic Church teaches that the dignity of all human life demands respect and that abortion is gravely sinful. See Catechism of the Catholic Church §§ 2270-75.
In August 2016, Jennifer Allmon, TCCB's Executive Director, voluntarily testified in administrative proceedings in favor of amending state regulations regarding the disposal of embryonic and fetal tissue. Proposed by the Texas Department of State Health Services ("DSHS"), the new regulations would prohibit disposing of fetal remains in a landfill or sewer, as had been earlier allowed. See 41 Tex. Reg. 9709-41 (2016). Ms. Allmon's written and oral testimony communicated the Bishops' conviction that fetal remains should be disposed of with respect.
Because a primary objection to the new regulations was the increased cost of interment, the Bishops considered facilitating *365 free burials for fetal remains.[1] On December 12, 2016, TCCB announced that it would work with Catholic cemeteries and funeral homes throughout Texas to offer free common burial[2] services to fetal remains produced as a result of abortions.
In late 2016, the plaintiffs-several Texas health care providers licensed to perform abortions in the state-challenged the fetal remains regulations pursuant to 42 U.S.C. § 1983. The plaintiffs alleged, inter alia , that the costs imposed by the regulations would violate Due Process by burdening the rights of women seeking an abortion. The plaintiffs sought a temporary restraining order and preliminary injunction. The district court granted the temporary restraining order on December 15, 2016 and scheduled a hearing on the preliminary injunction.
The plaintiffs argued, in part, that the fetal remains amendments would "make[ ] the availability of abortion services contingent on the ability and willingness of third-party vendors to bury or scatter the ashes of embryonic or fetal tissue at a non-prohibitive cost. ... These options are prohibitively expensive." In response, the State of Texas cited Ms. Allmon's testimony as evidence that a "non-profit group is prepared to provide for the burial of fetal tissue from all health-care providers across the state without charge."
Ms. Allmon testified at the preliminary injunction hearing, reiterating the Bishops' moral views and their commitment to absorb the costs associated with the burial ministry without providing religious rituals associated with the burial unless a parent so requested. She also testified that the Bishops had authority to commit Catholic cemeteries to participate in this program. On January 27, 2017, the district judge granted the preliminary injunction, finding that some terms in the regulations were unconstitutionally vague and that the rules impermissibly burdened abortion access. The State appealed.
While the appeal was pending, the Texas legislature moved to enact a law specifying legitimate methods for disposing of fetal remains. Ms. Allmon again testified on behalf of TCCB in favor of these provisions. As part of a larger abortion-related bill-SB8-these provisions were then signed into law in June 2017, set to take effect on February 1, 2018. See Tex. S.B. 8, 85th Leg., R.S., § 19(d) (2017).
The plaintiffs immediately moved to enjoin the new law. On January 29, 2018, the district court preliminarily enjoined the provisions of SB8 dealing with fetal remains disposal. The district court set a bench trial date for July 16, 2018 and referred discovery matters to a magistrate judge. On March 19, 2018, the parties stipulated that neither party would produce evidence concerning the cost of compliance with the challenged laws," with the plaintiffs affirming that they "waive[d] any argument ... that the monetary cost of compliance with the challenged laws contributes to their alleged unconstitutionality." This stipulation allows the plaintiffs to avoid disclosure of any of their financial information. Ms. Allmon is currently identified as a trial witness on behalf of the state and will testify in her capacity as Executive Director of TCCB.[3]
*366 On March 21, 2018, the eve of Holy Week for Christians, a period of intense religious devotional activity, the plaintiffs served TCCB with a third-party subpoena. The subpoena requested, in part, (1) "All Documents concerning EFTR [embryonic and fetal tissue remains], miscarriage, or abortion," (2) "All Documents concerning communications between [TCCB] and current or former employees of DSHS, HHSC, the Office of the Governor of Texas, the Office of the Attorney General of Texas, or any member of the Texas Legislature, since January 1, 2016," and (3) "All documents concerning the Act, the Amendments, or this lawsuit." The subpoena had no retrospective time limitation; made no exception for confidential internal or religious communications; and the return date of the subpoena was 9:00 a.m. on the Tuesday following Easter Sunday.
The Bishops filed their first motion to quash the subpoena and for a protective order on that Monday, April 2, 2018. They contended that the subpoena sought irrelevant evidence, that it violated the free exercise, freedom of speech, freedom of assembly, and freedom of petition guarantees of the First Amendment, that it violated the Religious Freedom Restoration Act ("RFRA"), and that it was unduly burdensome under Fed. Rule Civ. Pro. 45(d). The Bishops' motion was initially denied without prejudice for a failure to meet and confer with the plaintiffs regarding the scope of the subpoena.
Following the denial of TCCB's motion, counsel for TCCB and the plaintiffs met and conferred regarding the subpoena's scope. The plaintiffs agreed to limit their request to the following search terms: SB8, SB 8, Fetal, Fetus, Embryonic, Embryo, Abortion, Aborted, Miscarriage, Unborn, and burial ministry. They also limited the documents requested to those sent or received by Ms. Allmon on or after January 1, 2016.
The Bishops maintained objections to these requests, but nevertheless conducted a search, which returned over 6,000 pages of records. The Bishops ultimately turned over to the plaintiffs 4,321 pages of records,[4] including responsive documents representing communications with third parties such as state officials, Catholic conferences in other states, and Catholic cemeteries participating in the burial ministry.
At a scheduling conference on Friday, June 8, the magistrate judge informed the Bishops that they must file any further motion to quash by 9 a.m. on Monday, June 11, and that the motion would be argued on Wednesday, June 13. Under this tight schedule, the Bishops renewed their objections under the First Amendment, RFRA, and Rule 45(d). At the June 13 hearing, the magistrate judge specified that the parties should limit the focus of their arguments to the free exercise and freedom of association issues.
The plaintiffs explained their need for the remaining documents-namely, the documents' relevance for cross-examination purposes. The plaintiffs offered to withdraw their subpoena if Ms. Allmon withdrew as a voluntary witness. The Bishops produced a privilege log, identifying the documents-emails to or from Ms. Allmon-that it continued to withhold as privileged. The Bishops contended that the subpoena was an intimidation tactic to prevent TCCB from participating as a witness in the litigation. And they argued that the withheld documents were both privileged under the First Amendment and that the plaintiffs had no need for them. After the *367 hearing, Ms. Allmon submitted to a three-hour deposition by the plaintiffs, during which they were able to ask about the facts relevant for trial.
The magistrate judge denied the Bishops' motion to quash later that day. Although the ordinary time to appeal such a denial is 14 days,[5] the district court sua sponte ordered the Bishops to file any appeal within approximately 24 hours. The court denied the Bishops' motion for an extension of time to file the appeal. The Bishops complied with the order and filed their appeal by noon on Thursday, June 14. The district court denied the appeal on Sunday, June 17, and ordered the Bishops to produce the remaining documents within 24 hours.
The Bishops appealed, filing a motion for a stay in the district court and an emergency motion for a stay in this court. The district court "generously" granted a 72-hour stay of its order, but this court also granted a stay pending appeal and set an expedited briefing schedule. On June 19, the plaintiffs moved this court to dismiss TCCB's appeal and to vacate the stay. The plaintiffs argued that this court lacked appellate jurisdiction to review the district court's pretrial discovery order. TCCB responded to the motion to dismiss on July 2.
APPELLATE JURISDICTION
The plaintiffs contend that this court lacks appellate jurisdiction over this "interlocutory" discovery order. TCCB responds that because it is a third party to the litigation, it has no alternative avenue of appeal because having to await the conclusion of litigation by others, whenever and however that may occur, is out of its control and stymies its rights. Thus, while the court's discovery order is not generally "final" within the contemplation of 28 U.S.C. § 1291, TCCB asserts its rights under the collateral order doctrine, which permits appeals of interlocutory decisions (a) that are conclusive, (b) that resolve important questions separate from the merits, and (c) that are effectively unreviewable on appeal from the final judgment. Mohawk Industries v. Carpenter, 558 U.S. 100, 106, 130 S.Ct. 599, 605, 175 L.Ed.2d 458 (2009). For several reasons, we conclude that we do have jurisdiction.
The standards of the collateral order doctrine are met here. There is no dispute that the district court's discovery order was conclusive on TCCB, such that failure to comply with it may result in sanctions against TCCB or its witness. Further, the order resolves important and very novel issues separate from the merits of the litigation over the Texas statute concerning the disposal of fetal tissue remains. Finally, the plaintiffs do not have an answer to the argument that the consequence of forced discovery here is "effectively unreviewable" on appeal from the final judgment. Instead, they draw misplaced analogies.
First, they rely heavily, but inappositely, on Mohawk Industries v. Carpenter , in which the Supreme Court held that disputes over the discoverability of attorney-client communications are not subject to the collateral order doctrine. 558 U.S. at 114, 130 S.Ct. at 609. In Mohawk , the Court reasoned that as between parties, the appellate court can remedy erroneously ordered discovery by remanding the case for a new trial. Id. at 109, 130 S.Ct. at 606-07. From this standpoint, a discovery order breaching the attorney-client privilege is not "unreviewable on appeal." This case is distinguishable: a new trial order can hardly avail a third-party witness who *368 cannot benefit directly from such relief. Mohawk does not speak to the predicament of third parties, whose claims to reasonable protection from the courts have often been met with respect.
The Court also noted the general familiarity of courts with standards governing the attorney-client privilege, a fact that heightens courts' ability to review materials for which privilege is claimed; mitigates the potential for lower court discovery errors; and lessens the novelty of the issues. Id. at 110, 130 S.Ct. at 607. This case, on the other hand, is practically sui generis from the standpoint of the type of discovery sought and the issues raised by TCCB. As discussed below, neither we nor the plaintiffs nor TCCB have found a case on point. TCCB's claimed privileges, if applicable, go to the heart of the constitutional protection of religious belief and practice as well as citizens' right to advocate sensitive policies in the public square, a square that embraces both the legislature and the courthouse. Further, the courts have limited ability to assess the strength of religious groups' claims about their internal deliberations for purposes of monitoring discovery. Lacking guideposts from the legal arena, any such judicial attempt risks tension with the repeated judicial admonitions that courts stay out of the business of weighing the sincerity of religious beliefs and practices. See, e.g., Tagore v. United States , 735 F.3d 324, 328 (5th Cir. 2013). Mohawk , in short, does not prevent application of the collateral order doctrine in this case.
Moreover, on two occasions following Mohawk , this court has reaffirmed its precedent holding that interlocutory court orders bearing on First Amendment rights remain subject to appeal pursuant to the collateral order doctrine. See Marceaux v. Lafayette City-Par. Consol. Gov't , 731 F.3d 488, 490 (5th Cir. 2013) (citing Mohawk in its treatment of the intersection of collateral review and the First Amendment); In re Hearst Newspapers, L.L.C. , 641 F.3d 168 (5th Cir. 2011) ; see also Henry v. Lake Charles American Press, LLC, 566 F.3d 164, 180-81 (5th Cir. 2009) (collateral order appeal of denial of anti-SLAPP dismissal permitted, inter alia, because of potential impact on First Amendment rights); United States v. Brown , 218 F.3d 415, 420-21 (5th Cir. 2000). These authorities support our appellate jurisdiction when comparable First Amendment claims are at issue.
Having failed to cite our precedents on appealability, the plaintiffs rely instead on two cases from other circuits.[6] These cases, of course, must yield to our circuit precedent. In addition, neither Perry nor In re Motor Fuel Sales Practices involved discovery against a third party. Perry , in the end, upheld a qualified First Amendment privilege claim, while In re Motor Fuel Sales Practices is further distinguishable because the discovery sought information pertaining to potential fraud.
The plaintiffs finally reference a Fifth Circuit decision against a religiously affiliated college in a dispute over the enforceability of a charitable bequest. See *369 Ambassador College v. Geotzke , 675 F.2d 662 (5th Cir. 1982). Ambassador College is a strange decision on several grounds, but it is not a decision about appellate jurisdiction. This court's jurisdiction was firmly predicated on the district court's final order dismissing the case. We DENY the plaintiffs' motion to dismiss.
STANDARD OF REVIEW
Because trial is set to commence July 16, we elect to treat this appeal of the motion to quash on the merits. See Doe v. Office of Refugee Resettlement , 884 F.3d 269, 271 (5th Cir. 2018). We therefore pretermit the considerations pertinent to a stay pending appeal.
We review the district court's decision on a motion to quash for abuse of discretion. Wiwa v. Royal Dutch Petroleum Co. , 392 F.3d 812, 817 (5th Cir. 2004). "The district court's legal conclusions should be reviewed de novo, and its factual findings should not be disturbed unless they are clearly erroneous." Marceaux v. Lafayette City-Par. Consol. Gov't , 731 F.3d 488, 491 (5th Cir. 2013). A district court's discovery rulings are generally affirmed unless they are "arbitrary or clearly unreasonable." United States v. Butler , 429 F.3d 140, 148 (5th Cir. 2005). However, "in cases raising First Amendment issues[,] ... an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression." Marceaux , 731 F.3d at 491-92 (quoting Bose Corp. v. Consumers Union of U.S., Inc. , 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting New York Times Co. v. Sullivan , 376 U.S. 254, 285, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964) ) ).
DISCUSSION
I. The district court's order assumed, essentially, that this discovery dispute is like a garden variety dispute over the necessity of discovery from a corporate representative designated as a trial witness. Thus, the court rather hastily concluded that because the withheld internal communications (to which Ms. Allmon was privy) fell within the scope of the parties' agreed search terms, they were relevant and necessary to preparing the plaintiffs' cross-examination. The court thus overruled TCCB's objections based on relevance, undue burden, and necessity under Fed. Rule Civ. Pro. 45(d)(3)(A).
The court held that TCCB waived any privilege claim based on RFRA by not having timely raised that issue in proceedings before the magistrate judge.
Addressing TCCB's claims of First Amendment privilege, the court first rejected free exercise and establishment clause arguments because any such privilege claim is necessarily qualified, not categorical. The court also concluded, based on the magistrate judge's review of a selected portion of the internal communications, that "[t]here has been no showing Plaintiffs' discovery request infringes on TCCB's right to control its own affairs or interferes with matters of church governance, faith, or doctrine."
The court found TCCB's privilege claim based on the First Amendment right of association a closer, albeit unavailing, call. The court acknowledged "a limited [constitutional] right to associate with others for the common advancement of beliefs and ideas concerning political, economic, religious or cultural matters." The court's standard for the limited privilege accepted that "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be *370 achieved through means significantly less restrictive of associational freedoms." Perry , 591 F.3d at 1159 (quoting Roberts v. U.S. Jaycees , 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984) ). The court assumed that discovery requests in court meet the compelling interest test. It then held that although TCCB might have made a prima facie showing that enforcing production of the internal communications would chill the exercise of the body's rights (principally by discouraging the use of emails for internal conversation within TCCB), such a showing did not outweigh the plaintiffs' substantial interest in obtaining production. This weighing balanced the previous findings that the internal communications bear only on "facts" in issue at trial, against the relative "weakness" of TCCB's invasion of privacy compared with cases involving the deterrence of membership or advocacy.
II. With due respect to the district court, its analysis was incorrectly dismissive of the seriousness of the issues raised by TCCB. It is no accident that we have found no case directly on point on the issue of compelling discovery of internal communications within a religious body concerning its activities in the public square to advance and protect its position on serious moral or political issues.[7] It is no accident that several religiously affiliated organizations have filed amicus briefs in support of TCCB's claim.[8]
The difficulties we perceive with the court's analysis of the First Amendment claims are as follows. The court erred in determining that TCCB waived its claim of protection under RFRA. The court's analysis of the free exercise and establishment clause claims begs the fundamental, novel issues presented under these circumstances. The court's rejection of the free speech, association, and petition claims too narrowly construes the nature of chilling effects on those rights while overbroadly interpreting the importance to the plaintiffs of the discovery sought here.
Together, the dearth of guiding case law and the importance of context in any resolution of these issues counsel strongly in favor of the doctrine of constitutional avoidance. See Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 346-47, 56 S.Ct. 466, 482-83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); Hersh v. U.S. ex rel. Mukasey , 553 F.3d 743, 753-54 (5th Cir. 2008). Because a non-constitutional argument, founded on Rule 45(d) 's protection of parties subject to subpoenas, is here decisive, we need only sketch the problems inherent in the district court's insensitive constitutional approach.[9]
*371 To begin, Rule 45(d) states that a district court "must" quash a subpoena when it accepts a privilege claim, where "no exception or waiver applies." TCCB did not "waive" its argument that RFRA should have applied to the discovery request. The issue was clearly stated in TCCB's motion to quash. When the parties appeared before the magistrate judge, however, he advised them to focus on the First Amendment contentions. It cannot be waiver for TCCB to have acquiesced in the judge's directions at oral argument on the motion to quash.
Had the district court considered RFRA, it would have confronted authority that holds the law applicable to court-ordered discovery, i.e. , a grand jury subpoena. The Third Circuit has held, consistent with the coverage of RFRA itself, that a grand jury subpoena can implicate free exercise claims. See In re Grand Jury Empaneling , 171 F.3d 826, 835 (3d Cir. 1999) ("Lest there be any confusion, we reiterate: in deciding whether to enforce a grand jury subpoena over a RFRA objection, the district court must satisfy itself that the witness's testimony is necessary to serve a compelling state interest."). With that support, a RFRA claim depends on three conditions: a sincere claim of religious belief; a "substantial burden" that will be imposed on the exercise of that belief by particular government action; and whether the government shows a "compelling need" for the imposition and utilizes "least restrictive means" to achieve its goal. See Tagore , 735 F.3d at 330.
No one challenges the sincerity of TCCB's claim that the Church feels morally impelled to support humane (and "human") treatment of fetal remains. The "substantial burden" here is from compelling TCCB to reveal wholly internal communications concerning its approach to this issue and participation in the issues surrounding the statute. This court has previously discussed handling issues about sincere religious belief and substantial burden with "a light touch." Moussazadeh v. Texas Dep't of Criminal Justice , 703 F.3d 781, 792 (5th Cir. 2012), as corrected (Feb. 20, 2013). Moreover, the burden here comes from compelling TCCB to produce internal communications as the price for providing a witness in support of this controversial law, and subjecting TCCB to a threat of sanctions, ranging from monetary to striking the witness to contempt, if it fails to comply.
As for the government's (i.e. , the court's or litigant's using the court) compelling need and least restrictive means, they are not satisfied merely because the Federal Rules ordinarily authorize broad discovery. The plaintiffs have not shown how Ms. Allmon's existing testimony failed adequately to reveal TCCB's position or exactly what they sought from the 298 emails that have not been turned over. Insofar as those communications may reveal internal deliberations about the implications of TCCB's position under canon law and Catholic doctrine, there is no compelling need whatsoever.
*372 The plaintiffs and district court allege, however, that only "facts" relevant to this litigation from the internal communications are being subjected to discovery. But this decision begs two questions about the "compelling" nature of the "need." First, on what basis is the judiciary institutionally competent to discern which communications merely bear on the "facts" and which communications interfere with a religious body's free exercise? The district court assumed such competence exists. But see, e.g. , Moussazadeh, 703 F.3d at 792 (judiciary should take a "light touch" with matters of religious belief and practice); Tagore , 735 F.3d at 328 (noting that "claims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions"); Brief for the Jewish Coalition for Religious Liberty as Amici Curiae Supporting Appellants at 14-18 (explaining how regulations concerning kosher standards and processes implicate nuanced and controversial doctrinal views despite superficially objective determinations). The second question is whether the judiciary's actual performance of any such sorting task itself invades the religious body's integrity. Courts have generally foresworn involvement in disputes internal to religious groups. See Kedroff v. St. Nicholas Cathedral of Russ. Orthodox Church in N. Am. , 344 U.S. 94, 116, 73 S.Ct. 143, 154-55, 97 L.Ed. 120 (1952) ; Cannata v. Catholic Diocese of Austin , 700 F.3d 169, 172 (5th Cir. 2012).[10]
Finally, the least restrictive means seem to have been employed already. Ms. Allmon testified at the administrative hearing, the first preliminary injunction hearing, and in deposition only a few weeks ago, and she filed affidavits. TCCB voluntarily produced thousands of pages of documents reflecting external communications, at substantial cost in personnel time and attorney's fees.
We do not resolve these difficult questions, but no matter how you look at this RFRA claim, it was reasonable for TCCB to seek refuge under the federal law.
As for the free speech, free association, and petition claims under the First Amendment, the district court failed to afford sufficient scope to rights that should protect the inner workings of TCCB when it engages in activity in the public square. The district court seemed to limit the associational rights to the "chilling" of membership and tangible harassment. In Perry , however, the Ninth Circuit squarely considered these rights and exempted from discovery the internal communications of a citizens' group that was supporting California Prop 8 (opposing gay marriage). 591 F.3d at 1165. The court understood that communications within such a group must be permitted to be broad, uninhibited, and fearless, and that protecting such deliberations is a seminal aspect of the freedom to associate.
Perry , to be sure, recognized a qualified privilege based on Supreme Court precedent. See Perry, 591 F.3d at 1155-56 ; Flanagan v. United States , 465 U.S. 259, 267-68, 104 S.Ct. 1051, 1055-57, 79 L.Ed.2d 288 (1984) ; Gibson v. Fla. Legislative Investigation Comm., 372 U.S. 539, 557, 83 S.Ct. 889, 899, 9 L.Ed.2d 929 (1963). That balancing approach reconciles Perry with cases like Ambassador College v. Geotzke,[11] which was a fraud case against a *373 religious college, and United States v. Holmes ,[12] which held religious groups may be subject to government inquiries to maintain tax exempt status.
Contrary to the district court, however, the explanation of how TCCB's activities-and the activities of any other religious institution forced to endure similar discovery-are "chilled" by enforcement of this subpoena seems self-evident. As TCCB describes, in addition to the significant cost of complying with the original subpoena (100 work hours and over $20,000 in attorney's fees), TCCB has delayed and missed ministry opportunities; suffered in relationships with other Catholic ministries whose communications it was forced to disclose; was required to cancel internal ministry reports and training materials; TCCB bishops and staff were discouraged from engaging in other public policy activities; and Texas Catholic cemeteries were deterred from participating in the fetal remains registry. TCCB's ability to conduct frank internal dialogue and deliberations was undermined, and not only because enforcement of the subpoena inhibits the further use of email communications. Why the district court found "chilling" but not "severe" its discovery order's impact on TCCB's internal email communications, in this era of instant group communication, is hard to fathom. Even more disturbing, this discovery order forces TCCB to turn over to a public policy opponent its internal communications, setting a precedent that may be replicated in litigation anywhere.
These burdens flow naturally into TCCB's arguments for a privilege based on the structural protection afforded religious organizations and practice under the Constitution. "[I]t is easy to forget that the autonomy of religious groups ... has often served as a shield against oppressive civil laws. To safeguard this crucial autonomy, we have long recognized that the Religion Clauses protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs." Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171, 199-200, 132 S.Ct. 694, 712, 181 L.Ed.2d 650 (Alito, J., concurring) (citing Kedroff, 344 U.S. at 116, 73 S.Ct. at 154-55 ). Both free exercise and establishment clause problems seem inherent in the court's discovery order. That internal communications are to be revealed not only interferes with TCCB's decision-making processes on a matter of intense doctrinal concern but also exposes those processes to an opponent and will induce similar ongoing intrusions against religious bodies' self-government. Moreover, courts' involvement in attempting to parse the internal communications and discern which are "facts" and which are "religious" seems tantamount to judicially creating an ecclesiastical test in violation of the Establishment Clause. The Supreme Court has noted that "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. ... [A]nd an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission." Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 336, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987). The amici here uniformly decry the potential for misuse of the district court's narrowly focused balancing test that denigrated the impacts of judicial discovery procedures on their internal communications, while potentially empowering certain interest groups to harass, impose *374 disastrous costs on, and uniquely burden religious organizations. Yet the claim of religious organizations to maintain their internal organizational autonomy intact from ordinary discovery should be at least as secure as the protection constitutionally afforded other associations. Supreme Court decisions have protected religious organizations' internal deliberations and decision-making in numerous ways. See , e.g. , Hosanna-Tabor , 565 U.S. at 199-200, 132 S.Ct. at 712. Although none have spoken directly to discovery orders in litigation, the importance of securing religious groups' institutional autonomy, while allowing them to enter the public square, cannot be understated and reflects consistent prior case law.
Another way to look at the scope of a qualified First Amendment privilege is through the lens of hypothetical involvement by an abortion rights organization in this litigation. Suppose the plaintiffs offered testimony of a representative of Abortion Rights Unlimited ("ARU") (a fictitious group) to testify about the national status of fetal remains statutes and their general impact on abortion providers. Suppose the State of Texas issued a subpoena for any/all documents representing communications among the Board of ARU and the witness concerning those matters of discussion. Or the State agreed to withdraw its subpoena if ARU withheld offering its witness testimony. As a third-party witness, under the Perry balancing test, would the court subject ARU to such discovery? It seems the advocacy group would have a strong argument against forced disclosure of its internal communications as the price for its testimony on a matter of intense concern to the public and its members.
Assuming the seriousness of the chilling effects on their First Amendment rights, it is hard to see how the plaintiffs have borne their burden under Perry to show a substantial need for the documents that outweighs the intrusion into TCCB's constitutional rights. As noted in the next section, TCCB has already cooperated extensively in discovery in a way that minimizes any adverse impact on the plaintiffs' ability to cross-examine Ms. Allmon.
We need not and do not finally resolve whether the order enforcing discovery of the internal emails violated TCCB's constitutional rights, but the issues raised above should have given pause to the district court before it waved away TCCB's privilege claims.
III. The rule of constitutional avoidance prevents courts from issuing unnecessary and potentially overbroad or misleading rulings on constitutional issues. That rule forcefully counsels restraint in this case, where the issues are both novel and far-reaching and time is woefully short for thorough consideration.
We turn instead to applications of Rule 45(d), which states that a court "must" quash a subpoena to avoid "subject[ing] a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv). The district court applied the balancing test described by this court in Wiwa . See 392 F.3d at 818-19 (listing balancing factors). Wiwa explains that "if the person to whom the document request is made is a non-party, the court may also consider the expense and inconvenience to the non-party." 392 F.3d at 818. The court here concluded that no "undue burden" existed after eliminating the privilege claims and simply considering whether internal TCCB communications could provide "relevant facts" that the plaintiffs "need" to cross-examine Ms. Allmon about the "actual status" of TCCB's commitment to provide cost-free interment services. TCCB contends, however, that the subpoena inflicts an undue burden in compelling the organization to *375 disclose its internal communications when it has already been subjected to substantial discovery demands and raises substantial claims to constitutional and RFRA protection. Bearing in mind that TCCB is a third-party witness, we consider the strength of the court's relevancy and need determinations, and we conclude that the court's decision was an abuse of discretion.
First, the plaintiffs' "need" to obtain these additional emails is questionable at best. TCCB has already produced over 4,000 pages of responsive discovery documents, and Ms. Allmon has testified thrice and furnished affidavits, all of which can be used in her cross-examination. The plaintiffs' brief to this court discusses Ms. Allmon's prior testimony in support of their discovery request, quoting it at length for three pages, and calling it "vague," "contradictory" of her prior testimony, or downright inaccurate. Her recent deposition is 125 pages long. Further document discovery of any kind would, without further explanation, be cumulative. The plaintiffs have furnished no such further explanation, and the opinions of the magistrate and district judges do not hint that important additional facts, not yet divulged by TCCB, are revealed in the internal emails. In sum, the groundwork for cross-examination appears to be laid, especially for purposes of a bench trial.
Perhaps most telling, as this appeal is being decided, the plaintiffs have moved the district court to strike Ms. Allmon's testimony. (If granted, the motion would effectively prevent TCCB from airing its position in support of the statute.) In doing so, the plaintiffs characterize Ms. Allmon's testimony as "cumulative and a waste of trial time." The more "cumulative," obviously, the less is the "need" for and "relevance" of cumulative document discovery.
Concerning relevance, the plaintiffs' burden at trial is to show that the statute poses an "undue burden" on women's access to abortion services. To do so, they will probably try to demonstrate that many women clients do not care what happens to fetal remains or would have objections to burial in Catholic cemeteries; that TCCB's offer of free burials is vague, not concrete in detail, and has been watered down as the litigation progressed; that complying with the women's desires and finding the appropriate burial grounds would pose significant logistical problems and hardship for the plaintiffs' provision of abortion services; and that other suitable burial locations are unavailable. To the extent the plaintiffs seek to diminish the probative value of TCCB's offer, they have already gotten access to such ammunition. Catholic cemeteries, moreover, are but a small proportion of those statewide. Thus, TCCB's participation in facilitating the law cannot be the sole test of "burden" avoided or "burden" imposed for either party.
The small or non-existent incremental "need" for and "relevance" of this discovery alone impose a burden on TCCB, if it must produce documents unnecessary to the litigation. There is an additional burden on TCCB as a third party in this morally and politically consequential case: TCCB has been challenged by the plaintiffs to either produce internal communication documents or withdraw its witness. This looks like an act of intimidation. The demand places on TCCB the "Hobson's choice" of retreating from the public square or defending its position while creating a precedent (for the first time) that may open its internal deliberations to public scrutiny, or at least, ill-informed judicial scrutiny. This burden on TCCB's constitutional right to advocate in the public square cannot be ignored, nor can the burdens TCCB has shown were created by this intrusive discovery request: relations with other parties in the faith impaired, *376 internal modes of discussion upended, and participation by some Catholic cemeteries deterred.
Finally, rather than reject all of TCCB's privilege claims, the district court should have acknowledged their novelty and far-reaching implications and interpreted the appropriate scope of document production under Rule 45(d) in light of the principle of constitutional avoidance.
In sum, the district court discounted the burdens of production on TCCB and failed to require more than a minimal, if any, rationale for discovery of TCCB's internal communications. The court was too quick to reject TCCB's privilege claims. By acting in unnecessary haste, the court deprived TCCB of a fair opportunity to make its case for quashing the discovery. For these reasons, the district court erred and abused its discretion under Rule 45(d).
CONCLUSION
The court's order denying the motion to quash and compelling discovery of internal communications within TCCB is REVERSED . The plaintiffs' motion to dismiss the appeal and vacate the stay is DENIED .

Many dioceses in Texas already ran such burial ministries.

Common burial is when the remains of multiple fetuses are collected and buried together in a single grave, which reduces the cost of burial.

Ms. Allmon and TCCB participated as a third-party witness voluntarily. However, on June 25, Texas subpoenaed Ms. Allmon to testify at the trial.

TCCB estimates that, as of June 10, 2018, it had spent over 100 staff hours responding to the subpoena and accrued over $20,000 in attorney's fees and costs.

See W.D. Tex. Local Rules, Appendix C, Rule 4(a).

In one, the Ninth Circuit, shortly after Mohawk was issued, confronted a discovery order covering the internal deliberations of a public interest group that was litigating on behalf of California's Prop 8. In an abundance of caution, the court rejected use of the collateral order doctrine as a jurisdictional basis, but it proceeded to determine the merits of the case as a mandamus petition. See Perry v. Schwarzenegger , 591 F.3d 1147, 1156 (9th Cir. 2010). The Tenth Circuit more recently decided that "discovery orders adverse to a claimed First Amendment privilege are not immediately appealable" under the collateral order doctrine. In re Motor Fuel Temperature Sales Practices Litig. , 641 F.3d 470, 484 (10th Cir. 2011).

Williams v. Parker, 843 F.3d 617, 622-23 (5th Cir. 2016) is not applicable, because there the plaintiffs made only a "bare assertion" that their First Amendment rights had been violated, nor did they "explain how, precisely, their rights were curtailed."

See Brief for the Jewish Coalition for Religious Liberty as Amici Curiae Supporting Appellants; Brief for the Ethics & Religious Liberty Commission of the Southern Baptist Convention and National Association of Evangelicals as Amici Curiae Supporting Appellants; Brief for the United States Conference of Catholic Bishops et al. as Amici Curiae Supporting Appellants.
No doubt, the tension about the religious claims that spawned the amicus briefs was heightened by two strange circumstances suggesting at least religious insensitivity: (a) that the plaintiffs chose to time their original subpoena, and the return date, to coincide with Holy Week, and (b) that the district court chose to issue its decision rejecting the motion to quash on a Sunday morning when TCCB's members and employees were almost surely in church. No obvious time constraint justified either of these choices.

Like the district court, the dissent would pigeonhole this dispute as simply another discovery tiff that is resolved simply by an in camera look at the documents. This truncation can only occur, however, based on the assumption, stated by the dissent, that the scope of any Free Exercise privilege here is limited to judicial intrusions on church leadership or internal management. The dissent wholly overlooks the RFRA argument made by TCCB. And the dissent again assumes its Freedom of Association conclusion-that no associational privilege exists-by arbitrarily cabining the scope of "deliberative discussions" within TCCB. And by the way, this opinion only sets forth, but does not rule on , any of these substantial, novel claims. Instead, this opinion holds that the district court misapplied Rule 45(d), inflicted undue burden on TCCB, and in so doing abused its discretion.

As in the above discussion, the dissent's contention that TCCB forfeited its constitutional claims by voluntarily submitting documents for in camera inspection begs the questions about institutional competence and intrusion on internal religious governance. It is a clever argument that neither the district court nor the plaintiffs suggested.

675 F.2d 662, 664 (5th Cir. 1982).

614 F.2d 985, 989-90 (5th Cir. 1980).