# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 25, 2020

Lyle W. Cayce
Clerk

No. 19-60293

WILL MCRANEY,

*Plaintiff—Appellant*,

*versus*

THE NORTH AMERICAN MISSION BOARD OF THE SOUTHERN
BAPTIST CONVENTION, INCORPORATED,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:17-CV-80

ON PETITION FOR REHEARING EN BANC

(Opinion – 7/16/2020, 5 CIR., _____, _____ F.3D
_____ )

Before CLEMENT, HIGGINSON, and ENGELHARDT, *Circuit Judges*.

PER CURIAM:

The court having been polled at the request of one of its members, and a majority of the judges who are in regular active service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Circ. R. 35), the petition for rehearing en banc is **DENIED.**

In the en banc poll, 8 judges voted in favor of rehearing (Judges Jones, Smith, Elrod, Willett, Ho, Duncan, Oldham, and Wilson), and 9 judges voted against rehearing (Chief Judge Owen and Judges Stewart, Dennis, Southwick, Haynes, Graves, Higginson, Costa, and Engelhardt).

ENTERED FOR THE COURT:

STEPHEN A. HIGGINSON
*United States Circuit Judge*

James C. Ho, *Circuit Judge*, joined by Jones, Smith, Elrod, Willett, and Duncan, *Circuit Judges*, dissenting from denial of rehearing en banc:

If religious liberty under our Constitution means anything, it surely means at least this much: that the government may not interfere in an internal dispute over who should lead a church—and especially not when the dispute is due to conflicting visions about the growth of the church. But it turns out that nothing is sacred, for that is precisely what we are doing here.

The First Amendment forbids government intrusion in "matters of church government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). It secures church "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* "And a component of this autonomy is the selection of the individuals who play certain key roles." *Id.*

This case falls right in the heartland of the church autonomy doctrine. A former Southern Baptist minister brought this suit to protest his dismissal from church leadership. That fact alone should be enough to bar this suit. As the saying goes, personnel *is* policy.

Moreover, this case proves the truth of that old adage. The complaint acknowledges that the plaintiff was dismissed because he "consistently declined to accept" church policy regarding "the specific area of starting new churches, including the selection, assessing and training of church planters." He even *admits* that "this cause of action had its roots in Church policy." We should take him at his word. This case is a dispute over a church's vision for spreading "the gospel of Jesus Christ through evangelism and church planting"—a fundamental tenet of faith, not just for the defendant in this suit, but for hundreds of millions of evangelicals around the world. Put simply, this suit puts the church's evangelism on trial.

Not surprisingly, the district court dismissed this suit as barred by the First Amendment. We should have affirmed that decision. But the panel did the opposite. I respectfully dissent from the denial of rehearing en banc.

**I.**

The following facts are taken directly from Plaintiff's complaint and the strategic partnership agreement ("SPA") that gives rise to this dispute: The Baptist Convention for Maryland/Delaware ("Maryland/Delaware") is a state convention comprised of 560 Baptist churches that works in cooperation with the Southern Baptist Convention ("SBC"). The North American Mission Board ("North America") is a subdivision of the SBC that "exists to work with churches, associations and state conventions in mobilizing Southern Baptists as a missional force to impact North America with the gospel of Jesus Christ through evangelism and church planting." Its priorities include assisting churches in "planting healthy, multiplying, evangelistic SBC churches," "appointing, supporting, and assuring accountability for missionaries," and "providing missions education and coordinating volunteer missions opportunities for church members."

Maryland/Delaware and North America have worked together for some time under the terms of the SPA—a religious document whose stated purpose is "to define the relationships and responsibilities of [Maryland/Delaware] and [North America] in areas where the two partners jointly develop, administer and evaluate a strategic plan for penetrating lostness through church planting and evangelism."

Plaintiff Will McRaney is an ordained minister. As the former executive director of Maryland/Delaware, he guided the direction of the ministry and organization, as well as the screening and managing of all staff. He also served as Maryland/Delaware's designated representative in SPA negotiations with North America.

In 2014, North America drafted a new SPA that "gave [North America] more controls over the financial resources and the hiring, supervising and firing of staff positions of the state conventions." North America then began pressuring Maryland/Delaware—and McRaney in particular—to accept the new SPA. But McRaney "consistently declined to accept the newly written SPA." He "view[ed] the proposed SPA as a weakening of the autonomy of [Maryland/Delaware] and the relinquishment of all controls to [North America] in the specific area of starting new churches, including the selection, assessing and training of church planters."

In response, North America worked to oust McRaney from his church leadership position. It advised other Maryland/Delaware leaders that he had repeatedly refused to meet with North America's President. It also threatened to withhold all funding from Maryland/Delaware unless Maryland/Delaware dismissed McRaney and accepted the new SPA. As McRaney puts it, North America leaders "g[ave] a one-year notice of cancellation" of the previous SPA, and "set[] forth in [a] letter . . . false and libelous accusations against [McRaney]"—all "[a]s a direct result of [his] refusal to accept the new SPA." After a series of meetings with North America, Maryland/Delaware terminated McRaney.

McRaney filed this suit alleging that North America interfered with his contract with Maryland/Delaware and caused his termination. He also claims that North America lobbied another religious group to disinvite him from speaking at a large mission symposium in Mississippi. Finally, he contends that North America defamed him and caused him emotional distress by posting a photo of him in its headquarters' reception area that "communicate[d] he was not to be trusted and [was] public enemy #1."

The district court dismissed the suit under the First Amendment, reasoning that McRaney's claims would presumably require the court to

determine whether North America had "valid religious reason[s]" for its actions. *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention*, 2019 WL 1810991, at \*3 (N.D. Miss. Apr. 24, 2019).

But a panel of this court reversed, holding that "[t]he district court's dismissal was premature" because it is "not certain that resolution of McRaney's claims will require the court to interfere" with "purely ecclesiastical questions"—"matters of church government, matters of faith, or matters of doctrine." *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 350–51 (5th Cir. 2020).

## II.

"The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine'"—as the Supreme Court has repeatedly held, and reminded us again just this year. *Guadalupe*, 140 S. Ct. at 2055 (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). *See also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012); *Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich*, 426 U.S. 696, 721–22 (1976); *Watson v. Jones*, 80 U.S. 679, 733–34 (1871). The church autonomy doctrine "does not mean that religious institutions enjoy a general immunity from secular laws." *Guadalupe*, 140 S. Ct. at 2060. "[B]ut it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.*

So the district court was right to dismiss this suit, because each of the three actions taken by the religious organizations that McRaney wishes to challenge here—decisions about whom to place in leadership, whom to host at a religious conference, and whom to exclude from one's headquarters—is an "internal management decision[] that [is] essential to the institution's

central mission." *Id.* Each of these claims involves internal, "purely ecclesiastical" matters of church governance that federal courts have no business adjudicating. *Watson*, 80 U.S. at 733. *See id.* (describing certain matters as "strictly and purely ecclesiastical in . . . character, . . . over which the civil courts exercise no jurisdiction," including "matter[s] which concern[] theological controversy, church discipline, *ecclesiastical government*, or the conformity of the members of the church to the standard of morals required of them") (emphasis added).

For example, "the authority to select and control who will minister to the faithful"—that is, deciding who will lead and who will speak—"is the church's alone" because it is "a matter 'strictly ecclesiastical.'" *Hosanna-Tabor*, 565 U.S. at 195 (quoting *Kedroff*, 344 U.S. at 119). As a unanimous Supreme Court made clear, "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, . . . *interferes with the internal governance of the church*, depriving the church of control over the selection of those who will personify its beliefs." *Id.* at 188 (emphasis added). After all, "imposing an unwanted minister" or "[a]ccording the state the power to determine which individuals will minister to the faithful" violates *both* "the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments," *and* "the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Id.* at 188–89. *See also Guadalupe*, 140 S. Ct. at 2060 ("[A] church's independence on matters of faith and doctrine requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities.") (quotations omitted); *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 492 (5th Cir. 1974) ("Certainly a congregation's determination as to who shall preach from the church pulpit is at the very heart of the free exercise of religion.").

Likewise, a religious organization's decision to exclude and communicate internally about a former affiliate is a protected "internal management decision." *See*, *e.g.*, *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring) (explaining that "control over [certain] employees" is an "essential component" of a religious group's "freedom to speak in its own voice, both to its own members and to the outside world") (quotations omitted); *Watson*, 80 U.S. at 733 ("[C]ivil courts exercise no jurisdiction" over "matter[s] which concern[] . . . church discipline, ecclesiastical government, or the conformity of members of the church to the standard of morals required of them . . . ."); *Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018) (refusing to compel discovery of a third-party religious group's "internal communications" in part because the order "interfere[d] with [the group's] decision-making processes," "expose[d] those processes to an opponent," and "w[ould] induce similar ongoing intrusions against religious bodies' self-government"); *cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) ("Forcing a group to accept certain members may impair [its] ability . . . to express those views, and only those views, that it intends to express."); *see also* W. Cole Durham & Robert Smith, 1 Religious Organizations & the Law § 5:17 (2017) ("[T]he church autonomy case law . . . has resulted in [courts] declining to take jurisdiction over numerous subject matters related to religion, including . . . disputes concerning the discipline of church members, and claims arising from or related to church communications.").

So it's no surprise that the district court dismissed this suit. Because there's no way to adjudicate this dispute without violating the church autonomy doctrine. For example, the panel acknowledges that, to determine whether North America unlawfully interfered with McRaney's contract with Maryland/Delaware, a court will have to inquire why Maryland/Delaware voted to fire McRaney—including whether North America "intentionally

made false statements about him to [Maryland/Delaware] that resulted in his termination" or "damaged [his] business relationships"—and if so, whether to punish North America for doing so. *McRaney*, 966 F.3d at 349. Likewise, to determine whether North America's actions impermissibly deprived McRaney of a speaking slot at the mission symposium in Mississippi, a court will need to determine whether North America "got him uninvited to speak at the mission symposium"—and if so, why. *Id.* Finally, to hold North America liable for defamation and intentional infliction of emotional distress, a court will have to determine why North America circulated an internal opinion about McRaney and excluded him from its own headquarters—and then whether to punish North America for doing so.

All of this is anathema to the First Amendment. Decisions about who should lead, who should preach, and who should be excluded are all quintessential examples of "internal management decisions" that the Constitution leaves entirely to the discretion of the church. And this is especially so where, as here, these decisions were made as the result of a disagreement over a core mission of the church—establishing new churches and evangelizing new members.

## III.

The panel's various attempts to justify further proceedings in this case conflict with bedrock First Amendment doctrine in several additional ways.

At first, the panel suggests that this suit does not implicate the church autonomy doctrine, because McRaney is merely asking the court to apply "neutral principles of tort law," and because dismissal of the case would be tantamount to giving religious institutions a "preferred position in our society" by uniquely immunizing them from civil liability. *Id.* at 348–49, 351.

There are various problems with these rationales, as explained below. But among the most troubling is this: Under the panel's logic, no claim would

*ever* be subject to the church autonomy doctrine—*every* civil plaintiff purports to invoke neutral legal principles, and *every* application of the church autonomy doctrine grants religious organizations special treatment. Moreover, these justifications miss a foundational principle of our Constitution—that the whole point of the First Amendment is to give religion a "preferred position in our society." *Id.* at 348. *See*, *e.g.*, *Hosanna-Tabor*, 565 U.S. at 189.

Perhaps in recognition of these difficulties, the panel ultimately decides to backtrack. In the end, it suggests that it is merely too early in the case to invoke the church autonomy doctrine—and that the doctrine might be successfully deployed at a later stage of the litigation. But this too fails for multiple reasons. It's internally inconsistent with the panel's neutral principles and preferential treatment theories, which would presumably bar application of the church autonomy doctrine at *all* stages of the case. It misunderstands both the scope of and reasoning behind the church autonomy doctrine. And in any event, the district court already has what the panel says it needs to wait for—certainty that McRaney's case will turn on whether North America had "valid religious reason[s]" for its actions. *McRaney*, 966 F.3d at 351. Indeed, that standard was met with the very first docket entry in the case—it is clear from the face of McRaney's complaint (and further confirmed in his later filings) that this case is all about whether North America's actions were based on "valid religious reason[s]." *Id.*

## A.

To begin with, the panel contends that the church autonomy doctrine does not apply here because this suit only requires the court to apply "neutral principles of tort law." *Id.* at 349. This is wrong for at least three reasons.

First, the panel misinterprets the reference to "neutral principles of law" in *Jones v. Wolf*, 443 U.S. 595, 602–04 (1979). To be sure, *Jones* held

that courts may employ "neutral principles of law as a means of adjudicating a church property dispute"—specifically, that courts may "examine certain religious documents, such as a church constitution, for language of trust in favor of the general church." *Id.* at 604. But this was not to allow "religious autonomy concerns [to] be ignored whenever an ostensibly neutral or secular principle or policy seems relevant." 1 REL. ORGS. § 5:16. Rather, it was designed "to *protect* religious autonomy," including "internal formulations of religious doctrine and polity," "by assuring that secular courts would intervene in religious affairs *only* when the religious community itself had expressly stated in terms accessible to a secular court how a particular controversy should be resolved." *Id.* (emphases added). *Jones* thus includes the following cautionary note: "If . . . the interpretation of the instruments of ownership . . . require[s] the civil court *to resolve a religious controversy, then the court must defer to* the resolution of the doctrinal issue by *the authoritative ecclesiastical body*." 443 U.S. at 604 (emphases added).

So *Jones* is not an invitation to *courts* to decide all church property disputes—let alone all other manner of internal church disputes. Rather, it's an invitation to *churches*, where they deem it appropriate, to ask courts to assist them in resolving certain church property disputes.

Moreover, the panel's theory that this suit should be allowed because it involves only "neutral principles of tort law" is tantamount to saying that any plaintiff can litigate any case against a church, so long as he invokes a legal principle that complies with *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). After all, *Smith* ostensibly allows the government to impose "neutral law[s] of general applicability" on the religious and non-religious alike, so long as such laws are reasonably related to a legitimate government interest. *See id.* at 879, 881 & n.1. But the Supreme Court unanimously rejected this position in *Hosanna-Tabor*. There the government attempted to apply federal non-discrimination law to a

church on the ground that the law complied with *Smith*. *See* 565 U.S. at 189 ("The EEOC and [Plaintiff] . . . contend that our decision in [*Smith*] precludes recognition of a ministerial exception."). But that would require reading *Smith* to overturn over a century of church autonomy precedent. Not surprisingly, then, the Supreme Court dismissed this argument as having "no merit," noting that *Smith* does not govern "internal church decision[s] that affect[] the faith and mission of the church itself." *Id.* at 190. *See also* 1 REL. ORGS. § 5:12 (noting that *Hosanna-Tabor* "affirmed . . . that the principle of church autonomy prevails over a neutral and generally-applicable law[] if it interferes with a religious organization's dismissal of an unwanted minister"). The panel's "misguided application" of *Jones* "invokes external neutral standards to override religious autonomy," "profoundly weaken[ing] the protection [that] the religious autonomy cases have long provided against government intrusion in religious affairs," and "tak[ing] state power into protected domains in which []binding religious autonomy cases do not allow it to go." *Id.* at § 5:16.[1]

And consider this: If an appeal to "neutral principles of tort law" were all it took to sue a religious institution, it would be the exception that swallowed the rule. Under *Guadalupe* and *Hosanna-Tabor*, the church autonomy doctrine immunizes religious institutions from various anti-discrimination claims. *See also id.* at § 5:12 (noting that the Court's decision to allow church autonomy to bar suit brought under "a leading piece of federal civil rights legislation" only "demonstrates [the doctrine's] reach and power"). Surely the panel would not contend that anti-discrimination

---

[1] In any event, compliance with *Smith* is hardly the hallmark of First Amendment fidelity, considering that "[c]ivil rights leaders and scholars have derided . . . *Smith* . . . as 'the *Dred Scott* of First Amendment law.'" *Horvath v. City of Leander*, 946 F.3d 787, 794 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part) (citing authorities).

laws are *non*-neutral legal principles. So if the panel is right, then *Guadalupe* and *Hosanna-Tabor* must be wrong.

Second, the Supreme Court has never extended the "neutral principles of law" approach beyond the context of church-property disputes. To the contrary, the Court has "intimat[ed]" that the church autonomy doctrine "cannot be brushed aside as irrelevant or controlled by the 'neutral principles' rule of *Jones v. Wolf* merely because it is raised in defense to common law claims." *Id.* *See also id.* (noting that in *Hosanna-Tabor*, "the Court specifically mentioned contract and tort claims . . . as settings where the ministerial exception might apply"). In fact, the Supreme Court and lower courts have invoked the church autonomy doctrine across a broad range of claims—up to and even including church property disputes. *See id.* at § 5:17 (citing cases that "decline[d] to take jurisdiction over numerous subject matters related to religion, *including . . . disputes over church property*, disputes concerning religious employment, disputes between ministers or church leaders and the church, claims against clergy for malpractice or breach of fiduciary duty, claims against churches or church leaders for negligent hiring or poor supervision of employees, disputes concerning the discipline of church members, and claims arising from or related to church communications.") (emphasis added).

Finally, the panel opinion violates our rule of orderliness. In *Simpson*, a dismissed pastor, like McRaney, claimed that his suit could be resolved "on the basis of 'neutral principles of law,' which c[ould] be applied without establishing any particular view or interpretation of religious doctrine." 494 F.2d at 493. His suit only required the court to determine secular questions, he claimed—namely, whether he was fired for "his views on race and merger of the segregated church organization, and because of the color of his wife's skin." *Id.* This was not a "church dispute," he theorized, but a secular

"racial dispute." *Id.* In short, "Simpson would narrowly limit *ecclesiastical disputes* to differences in church *doctrine*." *Id.* (emphases added).

We rejected the argument. In doing so, we noted that the pastor's crabbed view of the church autonomy doctrine contradicted the "'spirit of freedom for religious organizations' . . . reflected in the Supreme Court's decisions"—including the "'power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Id.* (quoting *Kedroff*, 344 U.S. at 116).

## B.

The panel also contends that invoking the church autonomy doctrine here would "impermissibly place a religious [institution] in a preferred position in our society," and allow "religious entities [to] effectively immunize themselves from judicial review of claims brought against them." *McRaney*, 966 F.3d at 348, 351.

But the whole point of the First Amendment, of course, is to privilege religion. As the Supreme Court has unanimously stated, "the text of the First Amendment itself . . . gives special solicitude to the rights of religious organizations." *Hosanna-Tabor*, 565 U.S. at 189.

That we need to be reminded of this may be what is most alarming about this case. It is widely understood (or at least it used to be) that "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952). "Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths—these and all other references to the Almighty . . . run through our laws, our public rituals, [and] our ceremonies." *Id.* at 312–13.

So it should be beyond dispute that, "[w]hen the state encourages religious instruction or cooperates with religious authorities . . . it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups." *Id*. at 313–14.

In short, protecting religious institutions from government interference is not just the point of the church autonomy doctrine that the Supreme Court has recognized for nearly 150 years—it is foundational to who we are as Americans.

## C.

Having initially intimated that the church autonomy doctrine can *never* bar cases like McRaney's, the panel switches gears. It suggests that it is merely *too early* to dismiss the case on that ground. As the panel now theorizes, it is not yet "certain" that this case will require the court to examine whether North America acted for "valid religious reason[s]." *McRaney*, 966 F.3d at 351. North America must present some "evidence" of these religious reasons before a court may consider dismissal on First Amendment grounds. *Id.*

Again, this approach is internally inconsistent with the panel's neutral principles and preferential-treatment concerns, which would logically apply at all stages of a lawsuit. It is also wrong for a number of additional reasons.

To begin with, we have no right to condition application of the church autonomy doctrine on a religious institution's ability to produce "evidence" that it had "valid religious reasons" for its actions. *Id.* To the contrary, the Supreme Court has been very clear that the church autonomy doctrine does *not* "safeguard a church's decision to fire a minister *only* when it is made for a religious reason." *Hosanna-Tabor*, 565 U.S. at 194 (emphasis added). "[A]

15

church's independence on matters 'of faith and doctrine' *requires* the authority to select, supervise, and if necessary, remove a minister *without interference by secular authorities*." *Guadalupe*, 140 S. Ct. at 2060 (emphases added). That is why "the general principle of church autonomy" guarantees "independence," not only in "matters of faith and doctrine," but also in "matters of internal government." *Id.* at 2061.

The reason for the Court's categorical approach in this sphere is simple: Secular courts are not competent to determine what constitutes a "valid religious reason"—let alone whether a party has produced sufficient evidence of one. *See*, *e.g.*, *Milivojevich*, 426 U.S. at 713 ("For civil courts to analyze whether the ecclesiastical actions of a church . . . are . . . 'arbitrary' must inherently entail inquiry into [what] . . . canon or ecclesiastical law supposedly requires the church . . . to follow . . . . But this is exactly the inquiry that the First Amendment prohibits."); *Watson*, 80 U.S. at 733 ("[C]ivil courts exercise no jurisdiction" over "matter[s] which concern[] theological controversy.").

Moreover, forcing religious institutions to defend themselves on matters of internal governance is itself a tax on religious liberty. *See*, *e.g.*, *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979) (warning that "the very process of inquiry" into "the good faith of [a] position asserted by . . . clergy-administrators and its relationship to [the organizations'] religious mission" "may impinge on the rights guaranteed by the Religion Clauses"); *Hosanna-Tabor*, 565 U.S. at 205–06 (Alito, J., concurring) ("[T]he mere adjudication of . . . questions [regarding the "*real reason*" for the dismissal of a religious employee] would pose grave problems for religious autonomy: It would require calling witnesses to testify about the importance and priority of [a] religious doctrine . . . , with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission."); *Whole Woman's Health*, 896 F.3d at 373

(finding it "self-evident" that enforcing a subpoena against a third-party religious organization would "chill[]" the group's activities and "undermine[]" its ability to "conduct frank internal dialogue and determinations").

Indeed, by forcing a religious institution to produce "evidence" of valid religious reasons for its actions, the panel is approving the very kind of regime that the Supreme Court found so odious in *Corporation of the Presiding Bishopric of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987). "[I]t is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission. Fear of potential liability might affect the way an organization carrie[s] out what it underst[ands] to be its religious mission." *Id.* at 336.

Finally, even accepting the panel's incorrect standard, it is already obvious from the face of the complaint that litigating this dispute will inevitably require inquiry into North America's "valid religious reason[s]." *McRaney*, 966 F.3d at 351. McRaney himself argues that North America took action precisely because he refused to accept church policy in "the specific area of starting new churches, including the selection, assessing and training of church planters." He likewise admits in his response to the motion to dismiss that "this cause of action had its roots in Church policy" and "began as a battle of power and authority between two religious organizations."

\* \* \*

It should not be difficult for the district court to dismiss this case again on remand, even accepting the incorrect standards set forth by the panel. McRaney admitted, both in his complaint and elsewhere, that this case is

rooted in a dispute over church policy. Those statements were not mentioned by the panel, and they should be enough to show on remand that there is "evidence" that this case will turn on whether there are "valid religious reason[s]" behind the actions challenged here. *Id.*

I nevertheless find the panel decision troubling because it invites future challenges to internal church decisions based on "neutral principles of tort law." *Id.* at 349. And no doubt future plaintiffs will be less candid than McRaney in admitting the religious motivations at the heart of their disputes.

The denial of rehearing en banc in this case is accordingly an "ominous sign" and "grave cause for concern" for "those who value religious freedom." *Stormans, Inc. v. Wiesman*, 136 S. Ct. 2433, 2433 (2016) (Alito, J., dissenting from the denial of certiorari). I respectfully dissent.

ANDREW S. OLDHAM, *Circuit Judge*, joined by SMITH, WILLETT, DUNCAN, and WILSON, *Circuit Judges*, dissenting from the denial of rehearing en banc:

The Supreme Court has told us that the judicial power of the United States does not extend to ministry disputes. *Watson v. Jones*, 80 U.S. 679, 727 (1871); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2059–61 (2020). This case should've ended with a straightforward application of that doctrine. Dr. McRaney got into a ministry dispute with the Baptist Convention of Maryland/Delaware ("BCMD") and the North American Mission Board. The source of that dispute? McRaney did not share the religious organizations' ministry vision for church planting. So BCMD voted to terminate McRaney. Then McRaney brought the ecclesiastical dispute to the civil courts. The ecclesiastical-autonomy doctrine requires us to stay out of it. But our panel decision puts us in the middle of it. Indeed, the district court on remand is tasked with determining whether the ecclesiastical organizations have "valid religious reasons" for their actions. I respectfully dissent.

## I.

As always, I start with the Constitution's original public meaning. The ecclesiastical-autonomy doctrine has a rich historical pedigree. And that history informed the meaning of the Constitution and its Religion Clauses at the Founding.

## A.

In the Middle Ages, clergy were categorically exempt from the reach of civil courts. *See* FELIX MAKOWER, THE CONSTITUTIONAL HISTORY AND CONSTITUTION OF THE CHURCH OF ENGLAND 384–94 (London, 1895). During the reign of the Saxon kings, civil courts had no jurisdiction over clergy accused of even clearly secular crimes unless and

until the bishop divested them of their spiritual authority. LEONARD W. LEVY, ORIGINS OF THE FIFTH AMENDMENT 43 (1968); *see, e.g.*, Wihtræd c. 6 (695) ("If a priest allow of illicit intercourse; or neglect the baptism of a sick person, or be drunk to that degree that he cannot do it; let him abstain from his ministry until the doom of the bishop."); Alfred c. 21 (892) ("If a priest kill another man, . . . let the bishop secularize him; then let him be given up from the minister . . . ."); Edward and Guthrum c. 4 § 2 (906) ("If a priest commits a crime worthy of death, he shall be seized and kept until the bishop's judgment.").[1] And during the reign of King Edgar the Peaceful (959-975), the Church required all disputes between clergymen to be addressed before bishops and not secular courts. *See* MAKOWER, *supra*, at 389. Spiritual supervisors retained exclusive competence to discipline clergy, and civil courts could not intervene in church matters. *See id.* at 389–90.

The Church's exclusive jurisdiction over clergy served as a one-way jurisdictional boundary. *See id.* at 390–91. Although civil courts were powerless to interfere with the matters affecting clergy or other ministerial prerogatives, religious authorities extended their power into the operation of civil courts in a variety of ways. *See id.* at 385–86. For example, ecclesiastical leaders served alongside a "high civil official" on civil courts. *Id.* at 384. King Edgar mandated that "the bishop of the shire and the ealdorman" sit together as a civil judicial body empowered to apply both "the law of God" and "the secular law." Edgar III c. 5. Thus, while civil officials had no role in ecclesiastical matters, ecclesiastical officials adjudicated both sectarian and secular matters. *See* MAKOWER, *supra*, at 384–85; WILLIAM RICHARD

---

[1] Obviously, the present case involves only non-criminal controversies and, beyond that, is limited to disputes between and among ecclesiastical officials. The aforementioned examples are meant only to illustrate the ancient roots of ecclesiastical jurisdiction.

WOOD STEPHENS, THE ENGLISH CHURCH FROM THE NORMAN CONQUEST TO THE ACCESSION OF EDWARD I at 49 (1901).

The Norman Conquest further solidified the divide. Around 1076, King William I issued an ordinance formally divesting civil courts of subject matter jurisdiction over religious matters. *See* Ordinance of William I Separating the Spiritual and Temporal Courts ("[N]o bishop . . . shall . . . bring before the judgment of secular men any case which pertains to the rule of souls."); 1 WILLIAM STUBBS, THE CONSTITUTIONAL HISTORY OF ENGLAND IN ITS ORIGIN AND DEVELOPMENT 307–08 (3d ed. Oxford, 1897). The ordinance established separate ecclesiastical courts. STEPHENS, *supra*, at 49. As a result, bishops and other clergy were granted exclusive jurisdiction over all cases "pertain[ing] to the rule of souls." Ordinance of William I. Not only did the Church retain exclusive personal jurisdiction over cases involving its clergymen, it also gained exclusive subject matter jurisdiction over disputes involving "the canons and the episcopal laws." *Ibid.*; *accord* MAKOWER, *supra*, at 392. The resulting changes were legion. *See* STUBBS, *supra*, at 307–08.

Over the next several centuries, the civil and ecclesiastical courts continued to dispute the boundaries of their respective jurisdictions. *See* MAKOWER, *supra*, at 392–93. The courts each strived to extend their competence to reach additional categories of cases claimed by the other. *Ibid.* In their struggle, "[t]he lay courts employed new weapons" while "the clergy resorted to the old." Harold W. Wolfram, *The "Ancient and Just" Writ of Prohibition in New York*, 52 COLUM. L. REV. 334, 334 (1952).

For example, the clergy threatened to excommunicate civil judges who infringed ecclesiastical jurisdiction, while civil courts issued writs of prohibition. *Ibid.* Writs of prohibition were injunctive. *See* Norma Adams, *The Writ of Prohibition to Court Christian*, 20 MINN. L. REV. 272, 274

(1936). Blackstone described them as necessary to secure the jurisdiction of the King's Bench over secular controversies. 3 WILLIAM BLACKSTONE, COMMENTARIES *112. When issued, they stripped ecclesiastical jurisdiction and required transfer of the case to a civil court. *See* Adams, *supra*, at 274.

But a writ of prohibition was not always the last word. *See id.* at 291–92. An ecclesiastical court could challenge a writ of prohibition with a competing writ of consultation seeking return of the suit to its court. *Ibid.* The writs of prohibition and consultation created a procedural mechanism for deciding the appropriate venue for resolution of particular controversies. But they did precious little to clarify the jurisdictional boundary between the secular and sacred. The line between the two remained an oft-litigated source of controversy for centuries to come.

Consider for example the famed case of Nicholas Fuller. *See Nicholas Fuller's Case* (1607), 12 Co. Rep. 41 (K.B.). There, the High Commission—an ecclesiastical court—hauled Fuller before it to answer for various contemptuous statements he made against high commissioners and other religious authorities. *See* Roland G. Usher, *Nicholas Fuller: A Forgotten Exponent of English Liberty*, 12 AM. HIST. REV. 743, 747–48 (1907). But Fuller, a rabble-rousing lawyer, disputed the jurisdiction of the High Commission and sought a writ of prohibition to transfer the case to the King's Bench. *Id.* at 749–50. Fuller argued that because his case implicated slander and contempt—purely secular crimes—jurisdiction could not lie in an ecclesiastical court. *See* 12 Co. Rep. at 42; Usher, *supra*, at 749–50. The King's Bench issued the writ prohibiting ecclesiastical jurisdiction based on the secular crimes for which Fuller stood accused. Usher, *supra*, at 750. But upon reconsideration, Sir Edward Coke, then Chief Justice of the King's Bench, issued a writ of consultation partially returning jurisdiction to the High Commission. 12 Co. Rep. at 43–44. In doing so, Coke recognized and

reaffirmed the jurisdictional boundary between ecclesiastical and civil jurisdiction.

The important point for present purposes is not the precise contours of that boundary, which obviously changed over time. What matters is that the jurisdictional line prohibiting civil courts from intruding on ecclesiastical matters is an ancient one. It goes back to the Middle Ages. It has been part of England's formal law since William the Conqueror. It's so entrenched in English history that even Coke—the seventeenth century's fiercest champion of civil jurisdiction and the common law—respected it. And although there were disputes about boundaries of ecclesiastical jurisdiction over laypersons like Nicholas Fuller, there could be little dispute about ecclesiastical jurisdiction over ecclesiastical matters like ministry disputes and discipline.

B.

English philosopher John Locke also recognized the jurisdictional boundary between religious and civil authority. His *Letter Concerning Toleration* sought "to distinguish exactly the business of civil government from that of religion, and to settle the just bounds that lie between the one and the other." John Locke, A Letter Concerning Toleration 10 (J. Brook ed., 1796) (1689). Locke believed it was "the duty of the civil magistrate, by the impartial execution of equal laws, to secure unto all the people in general, and to every one of his subjects in particular, the just possession of these things belonging to this life." *Id.* at 11. But he recognized that because the "jurisdiction of the magistrate reaches only to these civil concernments . . . *it neither can nor ought in any manner to be extended to the salvation of souls*." *Ibid.* (emphasis added); *cf.* Ordinance of William I.

Locke's work was foundational to the original public understanding of church autonomy in America. *See* Michael W. McConnell, *The Origins and*

*Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1431 (1990) ("Locke's ideas . . . are [an] indispensable part of the intellectual backdrop for the framing of the free exercise clause."); Carl H. Esbeck, *Dissent and Disestablishment: The Church-State Settlement in the Early American Republic*, 2004 BYU L. Rev. 1385, 1420 (2004) ("Locke's theory was imbibed by most educated Americans . . . ."); Noah Feldman, *The Intellectual Origins of the Establishment Clause*, 77 N.Y.U. L. Rev. 346, 354 (2002) ("Locke's version of the idea of liberty of conscience formed the basic theoretical ground for the separation of church and state in America."). For example, Baptist preacher John Leland made almost verbatim Lockean arguments in favor of disestablishment: "The rights of conscience should always be considered inalienable—religious opinions a[re] not the objects of civil government, nor any way under its jurisdiction." John Leland, *The Yankee Spy: Calculated for the Religious Meridian of Massachusetts, but Will Answer for New Hampshire, Connecticut, and Vermont, Without Any Material Alterations* (1794), *reprinted in* The Writings of the Late Elder John Leland 213, 228 (1845). But Locke didn't go far enough for many Evangelicals. That's because Locke was a legislative supremacist—he believed a conflict between the law and matters of faith "does not take away the obligation of that law, nor deserve a dispensation." A Letter Concerning Toleration, *supra*, at 51. Locke attempted to rationalize his position by arguing that such conflicts would "seldom happen." *Ibid.*

That was hollow solace to "[t]he Baptists languishing in the Culpepper jail and the Presbyterians fighting legislative interference with their form of church governance." McConnell, *supra*, at 1445. So Evangelicals in America argued for disestablishment on grounds that establishment tended to corrupt religion through governmental interference. *See, e.g.*, *Declaration of the Virginia Association of Baptists* (Dec. 25, 1776), *reprinted in* 1 The Papers of Thomas Jefferson 660–61 (Julian P.

Boyd ed., 1950) [hereinafter PAPERS OF THOMAS JEFFERSON] (arguing that preachers should not be "Officers of the State" because "those whom the State employs in its Service, it has a Right to *regulate* and *dictate to*; it may judge and determine *who* shall preach; *when* and *where* they shall preach; and *what* they must preach."). And they argued that ecclesiastical jurisdiction must be defined by looking to "what matters God is concerned about, according to the conscientious belief of the individual." McConnell, *supra*, at 1446.

James Madison echoed those views. Madison's personal opinions did not always accord with the Religion Clauses he helped frame.[2] So I reference him simply as one datum in the public understanding of ecclesiastical jurisdiction. In 1785, when Virginia's legislature sought to pass a bill providing for compulsory support of religion, Madison penned the then-anonymous *Memorial and Remonstrance Against Religious Assessments*. Madison objected "[b]ecause if Religion can be exempt from the authority of the Society at large, still less can it be subject to that of the Legislative Body. The latter are but the creatures and vicegerents of the former. Their jurisdiction is both derivative and limited." James Madison, *Memorial and Remonstrance Against Religious Assessments* (June 20, 1785), *in* 5 THE FOUNDERS' CONSTITUTION 82 (Philip B. Kurland & Ralph Lerner eds., 1987). And further emphasizing the line between ecclesiastical jurisdiction and civil authority, Madison objected:

---

[2] To take one example, the First Amendment plainly allows Congress to have a Chaplain. *See Marsh v. Chambers*, 463 U.S. 783 (1983). As a member of the first Congress, Madison voted for the bill that established the Chaplain. *See* 1 ANNALS OF CONG. 891 (1789). Yet many years later, he expressed his personal view that the office was unconstitutional. *See* Elizabeth Fleet, *Madison's "Detached Memoranda,"* 3 WM. & MARY Q. 534, 558 (1946).

> Because the Bill implies either that the Civil Magistrate is a competent Judge of Religious Truth; or that he may employ Religion as an engine of Civil policy. The first is an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world: the second an unhallowed perversion of the means of salvation.

*Id.* at 83.

And even Thomas Jefferson—who had little or no sympathy for America's churches—evoked ecclesiastical jurisdiction. (Query, however, whether he did so unwittingly.) In 1801, the Danbury Baptist Association wrote to President-elect Jefferson, explaining that their "[s]entiments are uniformly on the side of Religious Liberty" and expressing hope that Jefferson would recognize that religion "is at all times and places a Matter between God and Individuals." 35 Papers of Thomas Jefferson, *supra*, at 407–09. Jefferson saw the letter as providing an opportunity "to reprimand his clerical and Federalist opponents and to propagate his own, profoundly anticlerical, vision of the relationship of religion to politics." Philip Hamburger, Separation of Church and State 144 (2002). Three months later, Jefferson responded:

> Believing with you that religion is a matter which lies solely between Man & his God, that he owes account to none other for his faith or his worship, that the legitimate powers of government reach actions only, & not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should "make no law respecting an establishment of religion, or prohibiting the free exercise thereof," thus building a wall of separation between Church & State.

36 Papers of Thomas Jefferson, *supra*, at 258.

Jefferson's wall metaphor went almost completely unnoticed in the nineteenth century. *See* Hamburger, *supra*, at 162–64. And it was generally misunderstood in the twentieth century: "[W]hat should be regarded as an important feature of religious freedom under constitutionally limited government too often serves as a slogan, and is too often employed as a rallying cry, not for the distinctiveness and independence of religious institutions, but for the marginalization and privatization of religious faith." Richard W. Garnett, *Pluralism, Dialogue, and Freedom: Professor Robert Rodes and the Church-State Nexus*, 22 J.L. & Religion 503, 504 (2006–2007). The Supreme Court invoked it, *see Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947), but not without criticism, *see Wallace v. Jaffree*, 472 U.S. 38, 107 (1985) (Rehnquist, C.J., dissenting) ("Whether due to its lack of historical support or its practical unworkability, the *Everson* 'wall' has proved all but useless as a guide to sound constitutional adjudication."). And in the twenty-first century, it appears the Supreme Court has relegated Jefferson's "wall" to dissenting opinions. *See, e.g.*, *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2105 (2019) (Ginsburg, J., dissenting); *Van Orden v. Perry*, 545 U.S. 677, 708 (2005) (Stevens, J., dissenting).

Of interest here, however, Jefferson did not invent the metaphor. Before Jefferson, Roger Williams invoked the wall as an aspirational "image of the purity he sought in religion." Hamburger, *supra*, at 38. Before Williams was Richard Hooker. *See id.* at 32–38 (explaining how the wall between church and state "first became widely known in England when [Anglican apologist] Richard Hooker ungenerously used it to characterize the position of Protestant dissenters who sought to purify the English church"). And before that, Christians had used the "ancient phrase," *id.* at 3, since the time of Jesus. *See* Garnett, *supra*, at 507 (noting that the separation of church and state was "an ancient Western teaching rooted in the Bible" (quoting John Witte, Jr., God's Joust, God's Justice: Law and

Religion in the Western Tradition 210 (2006))). Early Christians invoked the wall to "differentiate[] between civil and ecclesiastical jurisdiction—between the powers of *regnum* and *sacerdotium*." Hamburger, *supra*, at 23. And "they often took for granted that church and state were distinct institutions, with different jurisdictions and powers." *Id.* at 21.

## II.

Consistent with the history recounted above, the Supreme Court has held that the ecclesiastical-autonomy doctrine carries jurisdictional consequences. In *Watson v. Jones*, two competing church factions invoked civil jurisdiction to resolve their dispute over church property. 80 U.S. at 691–92. The dispositive issue was jurisdictional—namely, whether the judicial power of the United States extended to such ecclesiastical disputes. *See id.* at 732–33. The Court held that churches, rather than courts, have the final say over disputes implicating "theological controversy, church discipline, ecclesiastical government or the conformity of the members of the church to the standards of morals required." *Ibid.* The upshot: over ecclesiastical and religious controversies, "civil courts exercise no jurisdiction." *Id.* at 733.

Of course, "'jurisdiction' . . . is a word of many, too many, meanings." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) (quotation omitted). And the "profligate use of the term" has caused much confusion. *See United Pac. R.R. Co. v. Bhd. of Locomotive Eng'r & Trainmen Gen. Comm. of Adjustment Cent. Region*, 558 U.S. 67, 81–83 (2009) (describing the general confusion caused by courts using the word "jurisdiction" to refer to various unrelated legal concepts).

But the *Watson* Court emphasized that it really meant what it said. *See* 80 U.S. at 732–33. It explained that a civil court wielding the judicial power

to settle an ecclesiastical dispute would be tantamount to a church "try[ing] one of its members for murder, and punish[ing] him with death or imprisonment." *Id.* at 733. Such a sentence would "be utterly disregarded by any civil court" because the crime of murder falls within the exclusive jurisdiction of civil authorities. *Ibid.* Similar, the Court explained, is the exclusive jurisdiction of a church to settle ecclesiastical or ministerial disputes. *Id.* at 733–34. The Supreme Court later anchored *Watson*'s jurisdictional holding in the First Amendment. *See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (noting that the *Watson* "opinion[] radiates . . . a spirit of freedom for religious organizations" and "an independence from secular control or manipulation"). And the Court reaffirmed it in 1976. *See Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich*, 426 U.S. 696, 713 (1976) (preventing courts from inquiring into church personnel decisions in observation of "the general rule that religious controversies are not the proper subject of civil court inquiry"). So far so neat.

In subsequent cases, however, the Court created contrary rules. *See, e.g.*, *Jones v. Wolf*, 443 U.S. 595, 602 (1979) (explaining that "a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute"); *Emp. Div. v. Smith*, 494 U.S. 872 (1990) (purporting to exclude neutral laws of general applicability from First Amendment scrutiny). Then in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, the Supreme Court unanimously rejected the proposition that cases like *Smith* preclude ecclesiastical exemptions to neutral laws. *See* 565 U.S. 171, 189–90 (2012). At the same time, *Hosanna-Tabor* mentioned in a footnote that part of the ecclesiastical-autonomy doctrine "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." *Id.* at 195 n.4. And while *Our Lady of Guadalupe* broadly reaffirmed ecclesiastical autonomy in matters of faith, ministry, doctrine, and church

governance, it did not have occasion to consider whether the doctrine retains jurisdictional consequences. *Cf.* 140 S. Ct. at 2060 ("[C]ourts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions.").[3]

Since *Hosanna-Tabor*, confusion over the ecclesiastical-autonomy doctrine has increased. Some courts still see it as jurisdictional. *See, e.g.*, *Flynn v. Estavez*, 221 So. 3d 1241, 1247 (Fla. Dist. Ct. App. 2017) ("In Florida, courts have interpreted the doctrine as a jurisdictional bar, meaning a claim should be dismissed upon a determination that it requires secular adjudication of a religious matter." (quotation omitted)); *Bigelow v. Sassafras Grove Baptist Church*, 786 S.E.2d 358, 365 (N.C. Ct. App. 2016) (noting "the ecclesiastical abstention doctrine . . . is a jurisdictional bar to courts adjudicating ecclesiastical matters of a church"); *In re St. Thomas High Sch.*, 495 S.W.3d 500, 506 (Tex. App.—Houston [14th Dist.] 2016), *appeal dism'd sub nom. St. Thomas High Sch. v. M.F.G.*, 2016 Tex. App. LEXIS 5035 (Tex. App.—Houston [14th Dist.] July 12, 2016, no pet.) (noting the church-autonomy doctrine is "a threshold jurisdictional question"). Those courts think *Hosanna-Tabor* left *Watson*'s broader rule undisturbed. *See, e.g.*, *Church of God in Christ, Inc. v. L. M. Haley Ministries, Inc.*, 531 S.W.3d 146, 157

---

[3] If the ecclesiastical-autonomy doctrine retains jurisdictional consequences, it's not clear they come from the First Amendment. After all, the text of that Amendment does not purport to limit the judicial power of the United States—unlike say the Eleventh Amendment. *See* U.S. CONST. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."). On the other hand, the Supreme Court has made clear that States enjoy sovereign immunity *outside* of the Eleventh Amendment—and that immunity carries jurisdictional consequences. *See, e.g.*, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72–73 (2000); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 72–73 (1996). It's possible that the jurisdictional consequences of the ecclesiastical-autonomy doctrine likewise come from the original public meaning of Article III.

(Tenn. 2017) (recognizing that the "ecclesiastical abstention doctrine predates the ministerial exception by almost a century" and concluding *Hosanna-Tabor* "did not address" that doctrine).

But others think the *Hosanna-Tabor* footnote necessitates a reexamination of the jurisdictional consequences of ecclesiastical autonomy. *See, e.g.*, *Doe v. First Presbyterian Church U.S.A. of Tulsa*, 421 P.3d 284, 290–91 (Okla. 2017) (noting the church-autonomy doctrine "operates as an affirmative defense" (quoting *Hosanna-Tabor*, 565 U.S. at 195 n.4)); *St. Joseph Catholic Orphan Soc'y v. Edwards*, 449 S.W.3d 727, 737 (Ky. 2014) ("[T]he ecclesiastical-abstention doctrine is an affirmative defense."); *Pfeil v. St. Mathews Evangelical Lutheran Church of Unaltered Augsburg Confession of Worthington*, 877 N.W.2d 528, 534–35 (Minn. 2016) (reversing course on previous holding and noting "*Hosanna-Tabor* leads us to conclude that the ecclesiastical abstention doctrine is not a jurisdictional bar").

Of course, it's not our job to decide whether *Watson* remains binding. It remains binding on us until the Supreme Court says otherwise. *See, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (noting "it is [the Supreme] Court's prerogative alone to overrule one of its precedents"). And that's reason enough to justify rehearing this case en banc. *See* Fed. R. App. P. 35(b)(1)(A) (listing as a ground for rehearing that "the panel decision conflicts with a decision of the United States Supreme Court").

Moreover, this case is rich with questions of exceptional importance. *See* Fed. R. App. P. 35(a)(2). For example, ecclesiastical jurisdiction at one time extended to certain torts, like defamation, that today seem purely secular. *See* 10 Edw. 2, stat. 1 c. 4 (1316) (recognizing ecclesiastical jurisdiction over "defamations"); *cf. Fuller's Case*, 12 Co. Rep. at 44 (distinguishing between secular "slander" and ecclesiastical "Heresy, Schism, and erroneous Opinions, &c."). Does it extend to McRaney's

defamation claim? If so, does ecclesiastical autonomy require dismissal of it? What do we make of the post-*Hosanna-Tabor* split of authority on the jurisdictional consequences *vel non* of the ecclesiastical-autonomy doctrine? Our refusal to grant rehearing means these questions must wait for another day.